864 A.2d 460

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Harvey Miguel ROBINSON, Appellant.**

**Commonwealth of Pennsylvania, Appellee**

v.

**Harvey Miguel Robinson, Appellant.**

Supreme Court of Pennsylvania.

Argued April 8, 2003.

Decided Dec. 30, 2004.

166

168

172

Mary Rebecca Ennis, Broomall, Philip D. Lauer, Easton, for Harvey Miguel Robinson, appellant.

Jacquelyn C. Paradis, Allentown, Jennifer Lynne LeVan, Amy Zapp, Harrisburg, Maria L. Dantos, Allentown, for the Com. of PA, appellee.

Before: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and LAMB, JJ.

## OPINION

Justice NEWMAN.

Harvey Miguel Robinson (Appellant) brings this direct ap-

peal[1] from the Judgment of Sentence of the Court of Common Pleas of Lehigh County (trial court) that sentenced him to death following his conviction for first-degree murder. After reviewing the record and the claims raised by Appellant, we affirm.

## I. Facts and Procedural History

At about 12:35 a.m. on Wednesday, August 5, 1992, Allentown police were dispatched to a reported burglary at the residence of Joan Burghardt (Burghardt) at 1430 East Gordon Street, on the East Side of the City of Allentown. Burghardt, a twenty-nine-year-old white female, weighing 225 to 240 pounds, resided alone at that address, a one-bedroom, first-floor apartment in a residential neighborhood. She told the police that someone had entered her apartment between 11:00 p.m. Tuesday and 12:30 a.m. Wednesday, when she returned from taking a friend home. Burghardt noticed that a fan, which she left on before leaving the apartment, had been turned off, the patio door she had left open was closed, and the screen on the door, which was locked, had been ripped about six to eight inches, just enough to get a hand through, near the locking mechanism. Burghardt also reported that $40 to $50 was missing from a bank bag in her dresser drawer. In all other respects, Burghardt reported her apartment appeared to have been undisturbed.

At approximately 11:30 a.m. on Sunday, August 9, 1992, Burghardt's neighbor telephoned the police to complain that: (1) Burghardt's stereo had been on for three days and nights; (2) no one answered the doorbell; (3) the screen had been out of the window for three nights; and (4) during one of those nights it had sounded like somebody was beating Burghardt up, hitting the walls, and screaming. When the police arrived at Burghardt's apartment they noticed the screen for the front of the apartment was on the ground leaning upright next to the front window, the window was open, and the screen for the rear window was pushed out and lying on the ground beneath

1. This Court has jurisdiction of a direct appeal from a judgment of sentence in a case in which the death penalty has been imposed. 42 Pa.C.S. § 9711(h).

that window, which was also open. The screen on the patio door was cut about six inches long next to the door handle. The television was blaring loudly and the front door and the patio door were locked. The patio screen door was closed but not locked.

Upon entering the apartment, the police found Burghardt dead, lying on her stomach on the living room floor in front of her couch. There was a large amount of blood on the couch, walls, and floor. She was beaten severely about the head. Aside from where the body was found, the apartment appeared to be neat and orderly. With the exception of the screens, there were no pry marks on the doors or windows or other evidence of forced entry. The police concluded that the perpetrator entered the residence through the front window and exited through the rear window.

At the time of her death, Burghardt was wearing a sleep shirt and a pair of jockey shorts that were ripped at the crotch and pulled up. She was unclothed from her hips down. A dresser drawer in the bedroom was open and a pair of black shorts was on the floor. There were blood spots and white stains on the back of the shorts. A peach-colored shirt was located on the closet door. It contained a lot of blood in distinctive patterns that appeared to have been made by swipe marks from whatever was used as the murder weapon.

The subsequent autopsy revealed that Burghardt had been sexually assaulted and bludgeoned to death by thirty-seven individual blunt force injuries to her scalp, causing extensive skull fractures and damage to the brain. The weapon was a circular, cylindrical instrument about one-half to three-quarter inches in diameter with a smooth surface and about ten to twenty inches long. The force of the blows was so deliberate and tremendous that, as the instrument came down, it embedded hair between the fracture and skull.

Burghardt also had defensive injuries on both hands, evidencing that she was alive and attempting to protect herself from her assailant. Serology tests established that all of the blood and hair found at the scene, including those samples

found on the black shorts and peach colored shirt, were consistent with those of the victim. However, the shorts had seminal stains on the outside, as though someone had ejaculated onto them. Tests of the semen stains on the shorts showed the deoxyribonucleic (DNA) profiles that were later matched to the DNA profiles obtained from Appellant's blood.[2] An analysis of the blood spattering at the crime scene indicated the perpetrator was approximately 5'10" tall and stood over the victim during the attack.[3]

Approximately ten months later, at about 6:45 a.m. on Wednesday, June 9, 1993, Allentown police responded to a call of a reported missing person at 1058 East Gordon Street, a residential neighborhood, also on the East Side of Allentown. A resident became suspicious when the normally punctual newspaper delivery girl, Charlotte Schmoyer (Schmoyer), failed to deliver the newspaper. Her newspaper cart was left unattended for approximately thirty minutes in front of a neighbor's house and the newspaper had been delivered to another neighbor. Upon their arrival, the police found the unattended newspaper cart half-filled with the day's newspapers in front of the house; a separate copy of the newspaper; a Walkman radio and its headset separated from each other on the ground between two houses; and finger streaks on the windowpane of the door to the nearby garage of one of the houses. Police concluded that a struggle had ensued and Schmoyer, a fifteen-year-old white female, weighing 180 pounds, had been abducted.

Later that day, while searching a heavily wooded area at Allentown's nearby East Side Reservoir (Reservoir), the police found a bloody trail that led them to the body of Schmoyer, which was buried beneath some logs. Her sweatshirt was slightly pulled up; her sweatpants and underpants had been pulled down toward her knees. She had a large, gaping wound in her throat, separate stab wounds below that gash, multiple stab wounds on her back, and a patterned bruise on the right side of her cheek. An autopsy revealed twenty-two

2. N.T., 10/31/94, pp. 1258–61.

3. As it turned out, Appellant is 5'9" tall.

stab wounds, sixteen in the back (including seven that were fatal), and six in the front area of the neck (of which any combination of one or three would have been fatal). In addition, there were cutting and scraping wounds in the neck area, indicating they were inflicted while the victim was conscious and her neck bent down as a protective measure, and seven more cuts to the back of the sweatshirt, indicating that some struggle occurred in that the sweatshirt was cut but the body was not penetrated. The weapon was a single-edged knife about four inches long. At least two of the wounds were up to the hilt of the blade.

Subsequent serology and DNA tests indicated that Schmoyer had intercourse shortly before death. Appellant's DNA was found on her vaginal swab and blood consistent with that of Appellant and inconsistent with that of Schmoyer's blood, was found on her sweatshirt and sweatpants, along the trail leading to her body, and on leaves at the crime scene near her head.[4] All of the blood found on or about Schmoyer was consistent with that of either Schmoyer or Appellant; none of the blood was inconsistent with one of their profiles. A comparison of a hair found on the right knee of Schmoyer was consistent with hair from Appellant's head and inconsistent with Schmoyer's own hair; and a comparison of a hair found on the sweatshirt of Schmoyer was consistent with Appellant's pubic hair and, again, inconsistent with Schmoyer's own hair.

On June 28, 1993, Denise Sam–Cali (Sam–Cali), a thirty-eight-year-old white female weighing 160 to 165 pounds, and her husband resided at 1141 East Highland Street, on Allentown's East Side. That evening she was home alone; her husband was out of town. She awoke during the night to noises from within a walk-in closet near her bedroom door. As Sam–Cali attempted to flee the house, an assailant grabbed her. She exited the house, but the assailant grabbed her again on the front walk, flipped her on her back, and got on top of her using his knees to hold her down.

4. N.T., 10/31/94, pp. 1261–64.

As Sam–Cali and the assailant began to fight, he pushed down on her mouth, choked her, and punched her face at least four times. She tried to punch him and bit him on the inside of his upper right arm. He raped her and then ran through the house to escape by way of the back patio-door. Afterwards, Sam–Cali called the police. She had been beaten severely about the head, her neck had strangulation marks, and her lip was slashed. A large butcher knife wrapped in a paper napkin from her kitchen was found lying on the floor outside of her bathroom door. Following this incident, Sam–Cali and her husband left their East Allentown residence for a few days.

Approximately two weeks later, shortly after 7:00 a.m. on July 14, 1993, Jessica Jean Fortney (Fortney), a forty-seven-year-old white female, weighing 235 pounds, who resided with other members of her family at 407 North Bryan Street, on Allentown's East Side, was found dead in her bed. Fortney was half-naked; her shorts and underpants were pulled down mid-way between her knee and groin area and around only one thigh. Her face was swollen and black. She had dried blood about her lips, eye, nose, nostrils, and neck. There was blood spatter on the wall directly behind the sofa and on the lampshade next to the sofa. The window on the first floor was open; there was no screen in it.

The autopsy revealed that Fortney died in the early morning hours as a result of suffocation by strangulation (probably manual) and blunt trauma. There were in excess of fifty different injury patterns, many of them compatible with being beaten by a closed fist about the face. Some of them indicated an object, such as a ring, on her assailant's hands. Other injury patterns revealed that Fortney's attacker placed his knees on her during the beating, causing her blood to spatter on the wall, lampshade, and him. Serology tests established that Fortney had sexual intercourse within a few hours of her death. It was later determined that Fortney and Appellant had different blood profiles. Blood and body fluids from Fortney's vaginal swabs were consistent with Appellant's pro-

file and seminal fluid from Fortney's vaginal swabs matched Appellant's DNA.[5]

Four days after the Fortney homicide, on the evening of July 18, 1993, Sam–Cali and her husband returned home. At about 4:00 a.m. the next morning, Sam–Cali heard a noise in the house and then the back door opened. Thereafter, the alarm went off. The intruder apparently fled. From that night on, an Allentown police officer stayed at the Sam–Cali residence.

At approximately 1:25 a.m. on July 31, 1993, Officer Brian Lewis (Officer Lewis), who was at the Sam–Cali home, heard the doors being jarred and noticed someone at the front window. The officer saw the fingertips of a black-gloved hand removing the screen to the window. He then saw a head, and then the rest of the body, enter the home. When the intruder was fully inside the home, the officer challenged him. The intruder went to the kitchen and shots were exchanged. The officer retreated to the bedroom, where he heard banging and ripping at the kitchen door. Upon returning to the kitchen, the officer found the kitchen empty. The intruder escaped by breaking through several glass panels on a wooden door and pushing out the rear storm door.

At about 3:30 or 3:45 a.m., Officer Lewis was called to a local hospital where he identified Appellant as the intruder at the Sam–Cali home earlier that evening. Appellant had fresh, bleeding wounds to both of his arms and legs. He also had a healing scar of a bite mark several weeks old on his upper right arm. Later that day, the police obtained blood and hair samples from Appellant and searched his residence, where they found: (1) a black ski mask and a pair of gloves under the sofa cushions; (2) several drops of blood and a soaked, green-and-purple striped rugby-type shirt in the laundry; (3) additional blood in the bathroom; (4) additional pairs of gloves, including a pair of large black rubber gloves; (5) blood stained shorts and socks; (6) a pair of black high-tech sneakers in Appellant's bedroom; and (7) a loaded .380 semi-

5. N.T., 10/31/94, pp. 1263–65.

automatic handgun in the bedroom closet, which used to belong to the Sam–Calis prior to its disappearance some time before July 31, 1993.

The head stamp on the upper most cartridge in the handgun was identical with that on the empty cartridge casings found at the Sam–Cali house earlier that morning. Officer Lewis identified the horizontal striped shirt, shorts, sneakers, black knit cap, and rubber gloves found at Appellant's house, as those worn by the intruder at the Sam–Cali residence. Further, Sam–Cali identified Appellant as the person who assaulted and raped her.

It was later established that the patterned design of the bruise on Schmoyer's cheek was consistent with the size, design, and wear characteristics of the high-tech sneaker seized from Appellant's bedroom. There was no evidence found to exclude the possibility that the injury on her face was caused by Appellant's sneaker. Similarly, chevron patterns found on the Walkman radio that belonged to Schmoyer and found at the scene of her disappearance corresponded with the shape and spacing of Appellant's sneaker.

The police interviewed Appellant on August 4, 1993. At that time, Appellant told the officers that he drove his two-door Chrysler Laser automobile, and that he never drove his mother's four-door blue Ford Tempo automobile, license plate number ZGP260, except to look for jobs. In fact, at approximately 3:45 a.m. on September 7, 1992, a little less than one month after Burghardt's death, an Allentown police officer made a traffic stop of the blue Ford Tempo that Appellant was operating. On June 3, 1993, another Allentown police officer stopped the blue Ford Tempo at 2:40 a.m. and Appellant, its operator, was cited for driving the wrong way on a one-way street. At about 6:25 a.m. on the day of Schmoyer's abduction and death, June 9, 1993, James Stengel, an Allentown City employee at the Reservoir, saw a blue, four-door automobile (which he later identified as a Ford Tempo) with damage to its right side in the Reservoir parking lot. At about 6:40 a.m. on that day, a carpenter on his way to work identified Appellant as operating a blue automobile and acting strangely only three

blocks from the Reservoir. Finally, at about 3:30 a.m. on July 31, 1993, when he sought treatment at the hospital after the last Sam–Cali incident, Appellant was in possession of the blue Ford Tempo automobile, license plate ZGP260, with right side body damage. This automobile was owned by Appellant's mother and was registered to 709 North Kearney Street. Blood patterns subsequently found in the vehicle were later determined to be from Appellant.

Additional evidence also established that Appellant resided at 709 North Kearney Street, Allentown, in August of 1992, when Joan Burghardt was murdered, until September 23, 1992, and again from May 14, 1993, until his arrest on July 31, 1993, during which time Schmoyer and Fortney were murdered and Sam–Cali assaulted. Appellant did not reside in, or visit, Lehigh County between September 23, 1992, and May 14, 1993, because, during this period of time, he was detained in a juvenile placement facility on an unrelated charge. Appellant's residence at 709 North Kearney Street is about: (1) four blocks from 1057 East Gordon Street, where Schmoyer was abducted, and about one mile from the Reservoir where her body was found; (2) five blocks from 1430 East Gordon Street, where Burghardt lived and was murdered; (3) five or six blocks from 1141 East Highland Street, where Sam–Cali resided and was assaulted; and (4) two miles from 407 North Bryan Street, where Fortney lived and was murdered. It was also established that from 1984 until 1986, Appellant resided at 310 North Second Street, in Allentown, which is less than one block from the place of Fortney's murder.

On October 12, 1993, relating to the three incidents involving Sam–Cali, Appellant was charged with Information Nos. 2450/1993, 2451/1993, and 2452/1993, which included three counts of burglary[6] and related offenses, two counts of attempted homicide,[7] one count of rape[8] and related offenses, multiple counts of aggravated indecent assault,[9] and one count

6. 18 Pa.C.S. § 3502.
7. 18 Pa.C.S. § 2501; 18 Pa.C.S. § 901.
8. 18 Pa.C.S. § 3121.
9. 18 Pa.C.S. § 3125.

of firearms not to be carried without a license.[10] On the same day, the Commonwealth informed Appellant that it intended to try these Informations together.[11] Subsequently, on February 8, 1994, the Commonwealth filed additional Informations against Appellant in the following order: (1) as related to the Schmoyer homicide, No. 0055/1994, which included charges of criminal homicide, kidnapping,[12] rape, aggravated indecent assault, and indecent assault;[13] (2) as related to the Burghardt homicide, No. 0056/1994, which included charges of criminal homicide, burglary, criminal trespass,[14] rape, aggravated indecent assault, and indecent assault; and (3) as related to the Fortney homicide, No. 0058/1994, which included charges of criminal homicide, burglary, criminal trespass, rape, aggravated indecent assault, and indecent assault.[15] Similar to the charges filed on October 12, 1993, the Commonwealth notified Appellant that it intended to try Information Nos. 0055/1994, 0056/1994, and 0058/1994 together.[16]

On February 28, 1994, Appellant entered guilty pleas to: (1) burglary, attempted criminal homicide, and firearms not to be carried without a license in Information No. 2450/1993, in relation to the attack on Sam–Cali on June 29, 1993; (2) burglary in Information No. 2451/1993, in relation to the break-in at the Sam–Cali residence on July 19, 1993; and (3) burglary, attempted criminal homicide, and firearms not to be

10. 18 Pa.C.S. § 6106.

11. David Nichols, Esquire, represented Appellant in connection with these charges. *See* Original Record, CS–1 through CS–3.

12. 18 Pa.C.S. § 2901(a)(3).

13. 18 Pa.C.S. § 3126.

14. 18 Pa.C.S. § 3503(a)(1)(i).

15. On the same day, in Information No. 0057/1994, the Commonwealth charged Appellant with additional criminal acts, but the nature of these charges is not related to the disposition of the present appeal.

16. Initially, the Public Defender's Office undertook Appellant's defense in relation to the Informations filed in February of 1994. Shortly thereafter, the Public Defender's Office withdrew from representation, citing a conflict of interest. On April 22, 1994, the trial court appointed Carmen Marinelli, Esquire, to represent Appellant in relation to these charges and, subsequently, on September 9, 1994, also appointed James Burke, Esquire, to assist in Appellant's defense.

carried without a license in Information No. 2452/1993, in relation to the events at the Sam–Cali residence on July 31, 1993. Subsequently, the trial court sentenced Appellant to a forty-and-one-half to eighty-one year prison sentence in connection with his guilty pleas.

The parties proceeded on Information Nos. 0055/1994, 0056/1994, and 0058/1994, and, after a trial that lasted from October 10 through November 8, 1994, a jury found Appellant guilty of three murders of the first degree and all of the other offenses relating to the Burghardt, Schmoyer, and Fortney homicides. Following the penalty phase of the trial, on November 10, 1994, the jury sentenced Appellant to death for each of the three first-degree murder convictions. The jury found the following aggravating circumstances in each case: (1) the killing was committed during the perpetration of a felony; [17] (2) Appellant had a significant history of felony convictions involving the use or threat of violence; [18] and (3) Appellant "has been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue." [19] The jury found the additional aggravating circumstance of "torture" [20] in the Burghardt and Schmoyer homicides. The jury also found the following as mitigating circumstances pursuant to the "catch-all" provision of 42 Pa.C.S. § 9711: [21] (1) "family background and environment;" (2) "use of alcohol and drugs;" and (3) "school history." *See* Sentencing Verdict Sheets. On November 29, 1994, the trial court imposed additional sentences for the non-capital offenses.

17. 42 Pa.C.S. § 9711(d)(6).

18. 42 Pa.C.S. § 9711(d)(9).

19. 42 Pa.C.S. § 9711(d)(11).

20. 42 Pa.C.S. § 9711(d)(8).

21. The statute provides in relevant part as follows:
 Mitigating circumstances shall include ... [a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense.
 42 Pa.C.S. § 9711(e)(8).

Thereafter, Appellant filed a post-sentence motion on December 8, 1994, alleging various pre-trial and trial errors. On March 28, 1996, he filed a *pro se* "Clarification Motion for the Appointment of New Counsel," expressing his preference to raise trial counsel's ineffectiveness on direct appeal. On May 6, 1996, Appellant filed a *pro se* "Motion for Notes of Testimony and for Post Trial Discovery." By order dated May 17, 1996, and filed on May 21, 1996, the trial court relieved Appellant's trial counsel of further representation and appointed new counsel.[22]

Appellant was given until December 9, 1996, to amend his post-sentence motions or file new post-sentence motions. On April 23, 1997, Appellant filed a *pro se* Supplemental Motion for Relief pursuant to Pa.R.Crim.P. 720,[23] which was dismissed without prejudice to Appellant's right to incorporate it into motions filed by appointed counsel. Thereafter, counsel filed amended post-sentence motions on July 28, 1997, supplemental post-sentence motions on September 15, 1997, and second supplemental post-sentence motions on September 10, 1999. Several evidentiary hearings were held before the trial court during 1998 and 1999. By Order of June 29, 2001, the trial court denied the motions in all respects, except that Appellant's sentences of death for murder of the first degree in the Burghardt and Schmoyer homicides were vacated[24] and a re-

22. Initially, Worth Law Offices were appointed and Appellant was given until September 20, 1996, to amend his post-sentence motions or file new post-sentence motions. However, on July 23, 1996, the trial judge received a letter from Appellant alleging a member of Worth Law Offices had a conflict of interest with him. As a result, by order of July 31, 1996, separate counsel, John J. Waldron, Esquire, was appointed to represent Appellant for the limited purpose of determining the existence of any conflict of interest with his court-appointed counsel, and a hearing was scheduled on August 8, 1996, for that purpose. By order of August 9, 1996, Worth Law Offices were relieved of further representation of Appellant and current counsel was appointed to represent him.

23. At the time, this Rule was codified as Pa.R.Crim.P. 1410.

24. In its opinion, after pointing out that the jury found the aggravator embodied in 42 Pa.C.S. § 9711(d)(11) in relation to all three capital sentences, the trial court observed that: (1) this aggravator is explicitly limited to murders "committed either before or at the time of the offense at issue;" (2) the Burghardt homicide was committed before the Schmoyer and Fortney homicides; and (3) the Schmoyer homicide was

sentence proceeding was ordered in accordance with 42 Pa. C.S. § 9711. This statutory appeal followed.[25]

## II. Discussion

### A. Sufficiency of the Evidence

■ "This Court is required to review the sufficiency of the evidence to sustain a conviction of first-degree murder in every case where the death penalty has been imposed." *Commonwealth v. Koehler*, 558 Pa. 334, 737 A.2d 225, 233 (1999), *cert. denied*, 531 U.S. 829, 121 S.Ct. 79, 148 L.Ed.2d 41 (2000) (citing *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327, *rehearing denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983)). We perform this assessment regardless of whether the appellant explicitly raises a claim of insufficiency of the evidence. *Zettlemoyer*, 454 A.2d at 942 n. 3.

■ We have previously stated that:

When reviewing a sufficiency of the evidence claim, an appellate court must view all of the evidence and all reasonable inferences arising therefrom in the light most favorable to the Commonwealth as the verdict winner in order to determine whether the evidence was sufficient to enable the

committed before the Fortney homicide. In light of this, the trial court concluded that it was improper for the jury to consider the Schmoyer and Fortney homicides in relation to the Burghardt homicide, because they were committed after the Burghardt homicide. Similarly, the Fortney homicide should not have been considered in relation to the Schmoyer homicide, because it was committed after the Schmoyer homicide. Accordingly, the trial court vacated the death sentence for the first-degree murder convictions related to the Burghardt and Fortney homicides.

25. To facilitate appellate review of this case, by Opinion and Order of August 28, 2001, the trial court designated Appellant's convictions pursuant to Information Nos. 0055/1994 (relating to the Burghardt homicide) and 0056/1994 (relating to the Schmoyer homicide), where it vacated the sentence of death, eligible for interlocutory appeal pursuant to 42 Pa.C.S. § 702(b). We granted allowance of appeal in those cases. Thus, in the present matter Appellant challenges: (1) the guilt determinations concerning his convictions in relation to murders of Burghardt, Schmoyer, and Fortney; and (2) the sentence of death for the Fortney homicide.

fact finder to find that all of the elements of the offenses were established beyond a reasonable doubt.

*Commonwealth v. Hall,* 549 Pa. 269, 701 A.2d 190, 195 (1997); *cert. denied,* 523 U.S. 1082, 118 S.Ct. 1534, 140 L.Ed.2d 684 (1998). "This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt." *Commonwealth v. Burgos,* 530 Pa. 473, 610 A.2d 11, 13 (1992). To sustain a conviction of first-degree murder, the Commonwealth must prove that: (1) the appellant acted with a specific intent to kill; (2) a human being was unlawfully killed; (3) the appellant did the killing; and (4) the killing was done with deliberation. *See Commonwealth v. Watkins,* 577 Pa. 194, 843 A.2d 1203 (2003), *cert. denied,* —— U.S. ——, 125 S.Ct. 450, 160 L.Ed.2d 324 (2004); *Koehler,* 737 A.2d at 233.

■ The above-recited facts presented at Appellant's trial, viewed in the light most favorable to the Commonwealth, clearly establish the sufficiency of the first-degree murder conviction in relation to the Fortney homicide.[26] Specifically, the evidence presented was abundantly sufficient for the jury to conclude that, in the late night hours of July 13, 1993, and/or early morning hours of July 14, 1993, Appellant, possessing the requisite specific intent and with deliberation, unlawfully killed Fortney.[27]

## B. Claims Raised by Appellant

Appellant presents a number of arguments for this Court to consider.[28] Many of them involve allegations of counsel inef-

---

**26.** "To properly perform our statutory obligations," this Court reviews the sufficiency of the evidence in all cases where the death penalty is imposed. *See Zettlemoyer,* 454 A.2d at 942 n. 3. Presently, Appellant does not explicitly raise this claim and we have undertaken this analysis on our own accord. However, because the capital sentences were vacated in relation to the Burghardt and Schmoyer homicides, at this point in the proceedings, our duty extends to consider the sufficiency of the evidence only in relation to the Fortney homicide.

**27.** We find that the evidence was equally sufficient to support Appellant's ancillary convictions relating to the Fortney homicide.

**28.** In the present case, we have identified over sixty substantively independent issues presented by Appellant. This staggering number is

only indirectly related to the complexity and variety of the fact patterns involved in this matter. Rather, it appears that present counsel for Appellant has made a deliberate attempt to overwhelm this Court in an elaborate, legal conundrum. We reach this conclusion, because some of the raised claims are boilerplate reincarnations of arguments previously rejected by the courts of this Commonwealth, while others rely on blatant mischaracterizations of the trial record or involve meritless allegations of counsel ineffectiveness.

The approach to appellate advocacy embarked on by present counsel for Appellant brings to mind the words of the Honorable Ruggero J. Aldisert of the United States Court of Appeals for the Third Circuit:

> With a decade and a half of federal appellate court experience behind me, I can say that even when we reverse a trial court it is rare that a brief successfully demonstrates that the trial court committed more than one or two reversible errors. I have said in open court that when I read an appellant's brief that contains ten or twelve points, a presumption arises that there is no merit to **any** of them ... [and] it is [this] presumption ... that reduces the effectiveness of appellate advocacy.

Aldisert, "The Appellate Bar: Professional Competence and Professional Responsibility–A View From the Jaundiced Eye of the Appellate Judge," 11 Cap. U.L. Rev. 445, 458 (1982) (emphasis in original). Though much quoted by members of the judiciary, this passage often "rings hollow," as demonstrated by the present case. While we certainly understand the duty of the attorney to be a zealous advocate, we pose that conduct such as what we presently encounter does not advance the interests of the parties and, if anything, is a disservice to the client. *See, e.g., United States v. Hart,* 693 F.2d 286, 287 (3d Cir.1982) ("[b]ecause of the inordinate number of meritless objections pressed on appeal, spotting the one bona fide issue was like finding a needle in a haystack"); *also Commonwealth v. Ellis,* 534 Pa. 176, 626 A.2d 1137, 1140 (1993) ("[w]hile criminal defendants often believe that the best way to pursue their appeals is by raising the greatest number of issues, actually, the opposite is true: selecting the few most important issues succinctly stated presents the greatest likelihood of success"). As observed by Justice Robert H. Jackson:

> Legal contentions, like the currency, depreciate through over-issue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one ... [E]xperience on the bench convinces me that **multiplying assignments of error will dilute and weaken a good case** and will not save a bad one."

Jackson, "Advocacy Before the United States Supreme Court," 25 Temple L.Q. 115, 119 (1951) (emphasis supplied). *See also Smith v. Murray,* 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) ("Th[e] process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy"); *Jones v. Barnes,* 463 U.S. at 745, 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) (observing that "[e]xperienced advocates since time beyond memory emphasized the importance of winnowing out weaker argu-

fectiveness. In *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), this Court announced, as a general rule, that claims of ineffective assistance of counsel should be raised for the first time in a collateral proceeding. *Id.* at 738. The holding of *Grant* was applied retroactively to all cases pending on direct appeal. *Id.* Subsequently, in *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003), *cert. denied*, —— U.S. ——, 125 S.Ct. 30, 160 L.Ed.2d 31 (2004), the "Grant rule" was applied to capital cases.

On the same day as *Freeman*, this Court decided *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003), *cert. denied*, 540 U.S. 1115, 124 S.Ct. 1053, 157 L.Ed.2d 906 (2004). Although *Bomar* was on direct (capital) appeal at the time we decided *Grant*, this Court ruled that *Grant* would not apply to *Bomar*, where claims of counsel ineffectiveness "were properly raised and preserved in the trial court." 826 A.2d at 853. We reached this conclusion because, in *Bomar*, appellant raised ineffectiveness claims in post-sentence motions, the trial court conducted a series of evidentiary hearings on the claims raised, and, ultimately, addressed them in its opinion. *Id.* at 839, 853–54. Thus, the concerns we articulated in *Grant*—the ability of the defendant to develop his ineffectiveness claims and the ability of the reviewing court to consider them—were not implicated in *Bomar*. *Id.* By way of these decisions, the "Grant rule" became the staple of capital appellate jurisprudence in the Commonwealth.

██ Presently, because Appellant raised claims of counsel ineffectiveness before the trial court, the trial court conducted extensive evidentiary hearings in relation to these claims, and addressed their merits in its opinion, this case falls within the narrow exception to the "Grant rule" articulated in *Bomar*.

ments on appeal and focusing on one central issue if possible, or at most on a few key issues"); *Buehl v. Vaughn*, 166 F.3d 163, 174 (3d Cir.1999) (commenting that "[o]ne element of effective appellate strategy is the exercise of reasonable selectivity in deciding which arguments to raise"). Though we are mindful of the ramifications of our decisions in capital cases, no circumstance gives *carte blanche* for the borderline abuse of the legal system as represented by the conduct of Appellant's present attorney in this matter.

Accordingly, we will address the counsel ineffectiveness claims raised by Appellant through the following standard that this Court has set forth on numerous past occasions:

> As the starting point for our review ... we presume that counsel is effective. To overcome this presumption, appellant must establish three factors. First, he must show that the underlying claim has arguable merit. Second, appellant must prove that counsel had no reasonable basis for his action or inaction. In determining whether counsel's action was reasonable, we do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis. Finally, appellant must establish that he has been prejudiced by counsel's ineffectiveness; in order to meet this burden, he must show that but for the act or omission in question, the outcome of the proceedings would have been different. If it is clear that appellant has not met the prejudice prong of the ineffectiveness standard, the claim may be dismissed on that basis alone and the court need not [initially] determine whether the first and second prongs have been met.

*Commonwealth v. Rollins,* 558 Pa. 532, 738 A.2d 435, 441 (1999) (internal citations omitted); *see also Commonwealth v. Miller,* 572 Pa. 623, 819 A.2d 504, 517 (2002), *cert. denied,* 540 U.S. 827, 124 S.Ct. 50, 157 L.Ed.2d 50 (2003); *Commonwealth v. Tilley,* 566 Pa. 312, 780 A.2d 649, 652 (2001).

### 1. Pre-trial

#### a. Severance

■ Appellant argues that the trial court erred in denying his motion for severance of the charges involving the different victims.

Pennsylvania Rule of Criminal Procedure 582 [29] provides in relevant part:

29. At the time of Appellant's trial, this Rule was codified as Pa. R.Crim.P. 1127.

Offenses charged in separate indictments or informations may be tried together if ... the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion ...

Pa.R.Crim.P. 582(A)(1)(a). "Whether or not separate indictments should be consolidated for trial is within the sole discretion of the trial court and such discretion will be reversed only for a manifest abuse of discretion or prejudice and clear injustice to the defendant." *Commonwealth v. Newman*, 528 Pa. 393, 598 A.2d 275, 277 (1991); *also see Commonwealth v. Morris*, 493 Pa. 164, 425 A.2d 715, 718 (1981).

[While e]vidence of distinct crimes is inadmissible solely to demonstrate a defendant's criminal tendencies[, s]uch evidence is admissible ... to show a common plan, scheme or design embracing commission of multiple crimes, or to establish the identity of the perpetrator, so long as proof of one crime tends to prove the others. This will be true when there are shared similarities in the details of each crime.

*Commonwealth v. Keaton*, 556 Pa. 442, 729 A.2d 529, 537 (1999) (internal citations omitted), *cert. denied*, 528 U.S. 1163, 120 S.Ct. 1180, 145 L.Ed.2d 1087 (2000); *also see Commonwealth v. Natividad*, 565 Pa. 348, 773 A.2d 167, 174 (2001) (stating that "[e]vidence of another crime is admissible where the conduct at issue is so closely related that proof of one criminal act tends to prove the other"), *cert. denied*, 535 U.S. 1099, 122 S.Ct. 2300, 152 L.Ed.2d 1056 (2002). "To establish similarity, several factors to be considered are the elapsed time between the crimes, the geographical proximity of the crime scenes, and the manner in which the crimes were committed." *Commonwealth v. Rush*, 538 Pa. 104, 646 A.2d 557, 561 (1994).

Although Appellant admits that "the offenses consolidated in this case were of the same class,"[30] he argues that the crimes were not similar enough to be considered a distinctive *modus operandi* of a single perpetrator. Specifically, Appel-

**30.** Brief for Appellant, p. 12.

lant points out that: (1) Fortney lived two miles away from Burghardt and Schmoyer; (2) the crimes were not temporally related, but ranged over a period of eleven months; and (3) there is no "real relationship" in the way the victims were killed.[31]

As in *Morris,* however, "[i]t is difficult to conceive of any situation where the propriety of joinder could be clearer." 425 A.2d at 721. First, all of the attacks took place in the same general locale—the East Side of Allentown, within mere blocks from where Appellant lived or, as in Fortney's case, used to live. As previously described, Appellant's residence at the time of his arrest was about: (1) four blocks from where Schmoyer was abducted, and about one mile from the Reservoir where her body was found; (2) five blocks from where Burghardt lived and was murdered; (3) five or six blocks from where Sam–Cali resided and was assaulted; and (4) two miles from where Fortney lived and was murdered.[32]

Second, in relation to the temporal relationship between the crimes, this Court has held in the past that "remoteness in time between ... offenses" does not render consolidation improper *per se,* but is simply another factor to be considered in the analysis. *See Newman,* 598 A.2d at 278 (allowing introduction of evidence of another crime in spite of an eighteen-month gap between the two offenses); *Commonwealth v. Hughes,* 521 Pa. 423, 555 A.2d 1264, 1282–83 (1989)

31. Brief for Appellant, p. 13.

32. While it is true that Fortney's home appears to be further away from Appellant's residence than the other sites mentioned, we first point out that two miles is not such a long distance as to render this crime so distinguishable from the Schmoyer and Burghardt homicides that a consolidation of Informations would be inappropriate. *See, e.g., Commonwealth v. Wable,* 382 Pa. 80, 114 A.2d 334, 336–37 (1955), which involved a prosecution for murder of a truck driver that took place at a rest stop along the Pennsylvania Turnpike, where this Court, citing similarity in the way the crimes were committed, found no error in allowing testimony concerning: (1) another murder of a truck driver at a rest stop **in the same county** along the Pennsylvania Turnpike; and (2) a shooting of a truck driver on a highway in Ohio approximately **fifteen miles** from the Pennsylvania Turnpike. Second, we also take note that from 1984 until 1986, Appellant resided less than one block from where Fortney lived and was murdered.

(holding that a ten-month gap between two crimes was not too remote); *Commonwealth v. Donahue*, 519 Pa. 532, 549 A.2d 121, 127–28 (1988) (plurality opinion) (allowing testimony concerning three-year-old acts of child abuse in a case where the victim's death was caused by alleged child abuse). Presently, the attacks at issue span a period of eleven months, with the longest "idle" period (approximately ten months from August of 1992 through June of 1993) taking place between the Burghardt and Schmoyer homicides. Preliminarily, we note that eleven months is not such a long period of time as to render consolidation improper.

We further point out that, as previously explained, during an extended portion of this "idle" period, Appellant did not reside in, or visit, Lehigh County, because he was detained in a juvenile placement facility. In this respect, the present matter is remarkably similar to *Rush*, where eight years' separated commission of two similar assaults. 646 A.2d at 561. In that case, we observed:

> Normally such a lengthy interval would cause the occurrences to be considered too remote; however, for most of [these eight years] (with the exception of eighty-four days) appellant was incarcerated. Excluding this imprisonment, a time span of eighty-four days is within the acceptable remoteness standard.

*Id.* This rationale is equally applicable to the matter at hand— excluding the period of Appellant's detention at a juvenile placement facility, the crimes spanned approximately four months, which is well within "acceptable remoteness standards" set forth in our decisions. *See Newman, supra*; *Hughes, supra*. In sum, these observations only reinforce the trial court's conclusion with regard to the consolidation of the various Informations.

██ Finally, Appellant complains that joinder was improper, because there is no "real relationship" in the way the victims were killed. Nothing can be further from the truth, however. None of the victims knew or had any prior contact with Appellant. All were savagely beaten and raped within two months of Appellant leaving the Allentown area and two

and one-half months of his return to that locale. Each of the victims was brutally murdered at close range by hand or a hand-held instrument. In each case, Appellant left behind virtually no incriminating physical evidence, with the exception of what was subsequently discovered through microscopic, scientific examination. In all three cases, samples of Appellant's DNA were recovered from the crime scenes. Each attack was committed at night or in the early morning hours. Finally, all victims shared the same personal characteristics—they were overweight, white females, who lived in and around the East Allentown area.

Previously, analogous evidence has been held adequate to establish a sufficient logical connection for consolidation of trials. *See Keaton,* 729 A.2d at 537. We have also held that similar evidence was sufficient to allow testimony of a common scheme or plan in the way the crimes were perpetrated. *See Commonwealth v. Elliott,* 549 Pa. 132, 700 A.2d 1243 (1997) (evidence that defendant targeted other victims of similar race and gender and raped them was admissible to prove common scheme, plan, or design), *cert. denied,* 524 U.S. 955, 118 S.Ct. 2375, 141 L.Ed.2d 742 (1998); *Commonwealth v. Miller,* 541 Pa. 531, 664 A.2d 1310, 1318 (1995) (evidence that defendant lured other victims of similar race, weight, and gender into his car, took them to remote areas to force sex upon them, beat them in a similar manner, and killed or attempted to kill them was admissible to prove common scheme, plan, or design), *cert. denied,* 516 U.S. 1122, 116 S.Ct. 932, 133 L.Ed.2d 859 (1996); *Hughes,* 555 A.2d at 1282–83 (finding that testimony concerning a subsequent rape was properly admitted at trial for a preceding rape and murder, where: (1) the crimes were committed at approximately the same time of the day, in a similar geographic location, using similar method of attack; and (2) the victims were familiar with the defendant, and were of the same age, ethnicity, and gender); *Rush,* 646 A.2d at 561 (finding "sufficient similarities to warrant the conclusion that one individual committed both crimes," where, *inter alia,* the crimes were committed in the same geographic locale and the victims "were black, female, and relatively young, had their

underclothing or nightclothes pulled from them"). Moreover, the evidence concerning each incident was readily separable by the jury, as each crime was perpetrated against a different victim and there was no overlap in physical evidence. *See Keaton*, 729 A.2d at 538. For these reasons, we find that the trial court did not abuse its discretion in consolidating for trial the Informations relating to the homicides at issue.[33]

### b. Venue/Venire

Appellant next argues that the trial court erred in failing to grant his motion for change of venue/venire. He contends that the publicity surrounding the criminal episode at issue "was endless, incredibly inflammatory, and referred to [Appellant] as a serial killer" and, therefore, "it was impossible to select a fair and impartial jury in [Lehigh County]." Brief for Appellant, p. 16. Appellant specifically points out that one month before the trial, the Ladies' Home Journal printed an article, where Appellant was identified by name, which referred to the facts of the case that was not joined for trial and portrayed the details of Appellant's arrest "in sensational fashion." *Id.* at 16–17.[34] Appellant also claims that his counsel was ineffective for failing to: (1) "properly ... present and argue the motion for [change of venue];" and (2) make a "careful inquiry of the jurors regarding the Ladies' Home Journal article." Brief for Appellant, p. 17.

We have previously stated that:

The trial court's decision on appellant's motions for change of venue/venire rests within the sound discretion of the trial judge, whose ruling thereon will not be disturbed on appeal absent an abuse of that discretion. In reviewing the trial court's decision, our inquiry must focus upon whether any

---

**33.** In relation to the severance issue, Appellant also argues that his counsel was ineffective for failing to properly present and argue the severance motion. The record discloses that counsel in fact presented and argued that motion before the trial court. Accordingly, this argument is without merit.

**34.** The article described the initial attack on Sam–Cali, the subsequent incidents at her residence, and Appellant's ultimate apprehension. *See* Kathryn Casey, "I Caught My Rapist," LADIES' HOME JOURNAL, September 1994, Vol. CXI, No. 9, pp. 168–71, 225–26.

juror formed a fixed opinion of the defendant's guilt or innocence as a result of the pre-trial publicity.

A change in venue becomes necessary when the trial court concludes that a fair and impartial jury cannot be selected in the county in which the crime occurred. Normally, one who claims that he has been denied a fair trial because of pretrial publicity must show actual prejudice in the empanelling of the jury. In certain cases, however, pretrial publicity can be so pervasive or inflammatory that the defendant need not prove actual juror prejudice.

Pretrial prejudice is presumed if: (1) the publicity is sensational, inflammatory, and slanted toward conviction rather than factual and objective; (2) the publicity reveals the defendant's prior criminal record, or if it refers to confessions, admissions or reenactments of the crime by the accused; and (3) the publicity is derived from police and prosecuting officer reports.

Even where pre-trial prejudice is presumed, a change of venue or venire is not warranted unless the defendant also shows that the pre-trial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated. In testing whether there has been a sufficient cooling period, a court must investigate what a panel of prospective jurors has said about its exposure to the publicity in question. This is one indication of whether the cooling period has been sufficient. Thus, in determining the efficacy of the cooling period, a court will consider the direct effects of publicity, something a defendant need not allege or prove. Although it is conceivable that pre-trial publicity could be so extremely damaging that a court might order a change of venue no matter what the prospective jurors said about their ability to hear the case fairly and without bias, that would be a most unusual case. Normally, what prospective jurors tell us about their ability to be impartial will be a reliable guide to whether the publicity is still so fresh in their minds that it has removed

their ability to be objective. The discretion of the trial judge is given wide latitude in this area.

*Commonwealth v. Drumheller*, 570 Pa. 117, 808 A.2d 893, 902 (2002) (internal citations omitted), *cert. denied*, 539 U.S. 919, 123 S.Ct. 2284, 156 L.Ed.2d 137 (2003); *also see Hughes*, 555 A.2d at 1279; *Commonwealth v. Pursell*, 508 Pa. 212, 495 A.2d 183, 187–88 (1985).

■ Initially, we note that, despite referring to "sensational and highly inculpatory publicity . . . in all of the public media, from the day of the discovery of the incidents to the date of the trial," with the exception of the Ladies' Home Journal article, in his brief, Appellant does not specifically refer to any other publication or media outlet. Brief for Appellant, p. 15. Accordingly, because Appellant fails to make any contention relating to any specific item of pre-trial publicity other than the aforementioned Ladies' Home Journal article, even if we assume the existence of such publicity, we find that his argument fails in relation to those items. *See Commonwealth v. Casper*, 481 Pa. 143, 392 A.2d 287, 291 (1978) (observing that the mere existence of pre-trial publicity does not warrant a presumption of prejudice).

■ Furthermore, after thoroughly reviewing the record we are not persuaded by the complaints made by Appellant. Any potential bias on the part of the jurors in relation to the media coverage of the case was sufficiently dealt with during the individually-conducted *voir dire* when the defense counsel, the prosecutor, and the trial court, asked the potential jurors whether they had heard or read anything about the case. Indeed, unless preliminarily excused for other, unrelated reasons, **each of the prospective jurors** was questioned about their familiarity with the case and their knowledge concerning the incidents from media outlets. Some jurors stated that they knew about the incidents and they were further questioned about whether their ability to decide the case would be affected. The record reveals that of the jurors who were aware of the case, most gained their knowledge through the media reports circulated at the time of Schmoyer's homicide

and Appellant's apprehension, which was more than a year before the trial was set to begin.[35] This clearly indicates the presence of a sufficient "cooling off period" that minimized any potential ill effects of the publicity surrounding the events at issue.[36]

Ultimately, the twelve jurors and four alternates selected for trial all stated that they would be fair and impartial when hearing the case. After undertaking an independent review of the entire transcript of the *voir dire* proceedings, we are convinced that pretrial publicity did not result in the inability to select a fair and impartial jury in Lehigh County. Therefore, the trial court did not abuse its discretion in denying the motion for a change of venue/venire and Appellant is not entitled to any relief on this claim. For this reason, we find that Appellant is similarly not entitled to relief on his allegation of counsel ineffectiveness in relation to the motion to change venue/venire.

We also believe that the argument concerning the alleged failure of Appellant's counsel to question the venire persons about the Ladies' Home Journal article is patently unmeritori-

**35.** We note that prospective jurors who indicated that they formed an uncompromising opinion about Appellant from the news coverage were excused. *See, e.g.*, N.T., 10/10/1994, pp. 103–06, 168–69; N.T., 10/13/1994, pp. 1041–42; 1087–89, 1155–57; N.T., 10/14/1994, pp. 1265–66, 1406–07; N.T., 10/19/1994, pp. 2441–46. Similarly, potential jurors who learned through the media about Appellant's guilty pleas in relation to the incidents at the Sam–Cali residence were also excused. *See, e.g.*, N.T., 10/18/1994, pp. 2082–85.

**36.** In this matter, we are particularly guided by the words of the U.S. Supreme Court in *Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961),

It is not required . . . that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

ous. Presently, Appellant specifically argues that, "[a]t a minimum, [trial] counsel should have made a careful inquiry of the jurors regarding the Ladies Home Journal article, and **the record is devoid of any such questions.**" Brief for Appellant, p. 17 (emphasis supplied). Contrary to this declaration, on numerous occasions during *voir dire,* counsel for Appellant asked potential venire persons, two of whom were later accepted as jurors and one as an alternate, whether they subscribed to or read the Ladies' Home Journal. *See* N.T., 10/11/1994, p. 341, 565; N.T., 10/13/1994, pp. 961,[37] 1171; N.T., 10/18/1994, p. 2100; N.T., 10/20/1994, p. 2788. We believe that this clearly indicates that Appellant's counsel were aware of the article in the Ladies' Home Journal and, in fact, questioned the potential venire persons in relation to that publication. Therefore, we reject this claim without reaching its merits, because the record before us contradicts the allegation made by Appellant.

### c. Jury Array

Appellant argues that his trial counsel was ineffective for failing to ask the trial court to modify the procedures employed in Lehigh County to select members of the pool of jurors available to try this case. He points out that in Lehigh County trial jurors are selected from lists purchased from the Pennsylvania Department of Transportation (PennDOT) that contain names of residents of the county, who are registered with PennDOT. Appellant maintains that this procedure is "unlawful, improper, and violates [his] legal and constitutional rights" because: (1) "it is likely to result in juries unrepresentative of a cross section of the community, and . . . ha[s] continuously failed to represent certain identifiable population groups over an extended period of time;" (2) "the process systematically excludes youthful, elderly and disabled citizens, because the percentages of youthful, elderly and disabled

37. On October 13, 1994, Attorney Burke specifically questioned a prospective venire person whether she subscribed to the Ladies' Home Journal and, after receiving an affirmative answer, asked whether she remembered reading an article about Appellant. The venire person did not recall reading this article. N.T., 10/13/1994, p. 961.

voters is substantially smaller than the percentages of youthful, elderly and disabled citizens in the population of the county;" (3) "the process systematically excludes large numbers of non-caucasian population from jury service, because the percentage of non-caucasians driving or otherwise registered with [PennDOT] is substantially smaller than the percentage of non-caucasians in the population of the county;" (4) "the process systematically excludes large numbers of youthful, elderly and disabled citizens from jury service, because the percentage of youthful, elderly and disabled citizens driving or otherwise registered with [PennDOT] is substantially smaller than the percentage of non-caucasians in the population of the county;" and (5) "[t]he system violates the statutory requirements for the selection of trial jurors." Brief for Appellant, pp. 18–19.

The applicable Pennsylvania statute, entitled "Selection of prospective jurors," provides in relevant part:

At least annually the jury selection commission shall prepare a master list of prospective jurors. The list shall contain all voter registration lists for the county, which lists may be incorporated by reference, or names from such other lists which in the opinion of the commission will provide a number of names of prospective jurors which is equal to or greater than the number of names contained in the voter registration list.

42 Pa.C.S. § 4521(a). We have held on numerous occasions that to establish a *prima facie* violation of the requirement that a jury array fairly represent the community, the defendant must prove that: (1) the group allegedly excluded a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such people in the community; and (3) this under-representation is due to systematic exclusion of the group in the jury selection process. *See Commonwealth v. (Raymond) Johnson*, 576 Pa. 23, 838 A.2d 663, 682 (2003), *cert. denied,* —— U.S. ——, 125 S.Ct. 617, 160 L.Ed.2d 471 (2004); *Commonwealth v. (Roderick) Johnson*, 572 Pa.283, 815 A.2d 563, 575 (2002). For purposes of

this analysis, " '[s]ystematic' means caused by or inherent in the system by which juries were selected." *(Roderick) Johnson,* 815 A.2d at 575.

At the time of Appellant's trial, Lehigh County drew its jury pool from the list of licensed drivers in the county. *See* N.T., 10/19/1994, pp. 2329–58. Four years ago, in *Commonwealth v. Lopez,* 559 Pa. 131, 739 A.2d 485 (1999), *cert. denied,* 530 U.S. 1206, 120 S.Ct. 2203, 147 L.Ed.2d 237 (2000), we addressed this method of jury selection in Lehigh County, finding it "statutorily permissible," *Lopez,* 739 A.2d at 494 n. 13, and see no reason to reconsider our decision. Additionally, despite his complicated argument, Appellant utterly fails to present even a semblance of statistical proof that the jury pool selection procedure utilized in Lehigh County unfairly misrepresents the number of non-caucasians, youthful, elderly, and disabled citizens in the community. Accordingly, Appellant has not established even a *prima facie* argument for purposes of this analysis, *see Lopez,* 739 A.2d at 495, and his ineffectiveness argument on this issue fails.

### d. *Voir Dire*

In relation to the *voir dire* process, Appellant argues that his counsel were ineffective in failing to pose "life qualification" [38] questions to the potential jurors "in order to prevent the service of a juror who is incapable of returning a verdict of life imprisonment." Brief for Appellant, p. 45.

In the past, this Court has consistently declared that: (1) there is no requirement for trial counsel to ask "life-qualifying" questions; and (2) trial counsel is not ineffective for failing to make such an inquiry. *See, e.g., Commonwealth v. Bond,* 572 Pa. 588, 819 A.2d 33, 50 (2002); *Commonwealth v. Simmons,* 569 Pa. 405, 804 A.2d 625, 638 (2001) (plurality opinion) ("[t]here is no implication or holding that the choice **not** to life qualify a jury amounts to advocacy so glaringly

---

**38.** "Life qualification" refers to the process in which counsel identifies and excludes those prospective jurors who would be unable to consider a sentence of life imprisonment for a conviction of murder in the first degree. *See Keaton,* 729 A.2d at 542 n. 9.

substandard as to amount to a deprivation of the Sixth Amendment right to counsel") (emphasis in original); *Commonwealth v. Henry*, 550 Pa. 346, 706 A.2d 313, 324–25 (1997), *habeas corpus granted in part, Henry v. Horn*, 218 F.Supp.2d 671 (E.D.Pa.2002); *Commonwealth v. Lark (Lark PCRA)*, 548 Pa.441, 698 A.2d 43, 48 (1997); *Commonwealth v. Cox*, 546 Pa. 515, 686 A.2d 1279, 1290 (1996) (counsel was not ineffective for failing to "life-qualify" jurors where jurors "assured" the court that they would follow the law and the court's instructions), *cert. denied*, 522 U.S. 999, 118 S.Ct. 567, 139 L.Ed.2d 407 (1997).

 Presently, the notes of testimony are replete with examples where both defense counsel and the prosecutor asked the prospective jurors whether they would be able to be fair and impartial in deciding the case and whether they could follow the trial court's instructions in imposing the proper sentence. Additional questions were posed to ensure that the jurors would not automatically impose the death penalty, but would follow the statutory guidelines as explained to them by the trial court. That is all that is legally required of the jury and, therefore, we reject the argument raised by Appellant.

 In a related claim, Appellant contends that, by allowing the prosecutor to question prospective jurors about their attitudes towards capital punishment and excluding from the jury, by court-sanctioned "for cause" challenges, all jurors with a fixed opposition to the death penalty, the trial court erroneously permitted the Commonwealth to "death-qualify" the jury. Appellant also annexes an ineffectiveness claim to this argument, citing his counsels' failure to object to this supposed error by the trial court.

This argument, however, lacks merit in light of the repeated holdings by the United States Supreme Court and this Court allowing exclusion from the jury of any persons whose views on capital punishment would prevent or substantially impair their performance of duties as jurors in accordance with instructions and oaths. *See, e.g., Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986); *Common-*

*wealth v. King,* 554 Pa. 331, 721 A.2d 763, 778 (1998) (observing that "[t]his Court repeatedly held that the process of screening prospective jurors to determine whether any has moral, religious, or ethical beliefs that would prevent him or her from voting for the death penalty is consistent with the guarantees of a fair trial"), *cert. denied,* 528 U.S. 1119, 120 S.Ct. 942, 145 L.Ed.2d 819 (2000); *Commonwealth v. Lambert,* 529 Pa. 320, 603 A.2d 568, 575 (1992). Similarly, the ineffectiveness argument fails, because we will not find counsel ineffective for failing to raise a meritless objection.

■ Appellant also argues that the trial court erred in permitting the prosecutor to question prospective jurors about whether Appellant's age would prevent them from imposing the death penalty. Again, Appellant maintains that trial counsel was ineffective for failing to raise an objection on this ground.

"The scope of the *voir dire* rests in the sound discretion of the trial judge, whose decision will not be reversed unless palpable error is established. The purpose of voir dire is to ensure the empanelling of a fair and impartial jury capable of following the instructions of the trial court." *Commonwealth v. Bridges,* 563 Pa. 1, 757 A.2d 859, 872 (2000) (internal citation omitted), *cert. denied,* 535 U.S. 1102, 122 S.Ct. 2306, 152 L.Ed.2d 1061 (2002); *see also Commonwealth v. Marrero,* 546 Pa. 596, 687 A.2d 1102, 1107 (1996), *cert. denied,* 522 U.S. 977, 118 S.Ct. 434, 139 L.Ed.2d 334 (1997); *Commonwealth v. (James) Smith,* 518 Pa.15, 540 A.2d 246, 256 (1988) (stating that "[t]he purpose of the *voir dire* examination is not to provide a better basis upon which a defendant can exercise his peremptory challenges, but to determine whether any venireman has formed a fixed opinion as to the accused's guilt or innocence").

We note that Appellant fails to acknowledge that, just like the prosecution, defense counsel questioned the potential jury members about Appellant's age and its relation to their feelings about imposition of the death penalty. *See, e.g.,* N.T., 10/17/1994, p. 1920; N.T., 10/18/1974, pp. 1975–76; N.T.,

10/19/1994, p. 2414. Given that both the defense and the prosecution questioned the venire persons on this issue, we fail to see any error on the part of the trial court in the present case. In light of these mutual inquiries, any objection that the defense would have raised on this ground before the trial court would have been overruled as meritless. Accordingly, we also reject this allegation of ineffectiveness.

Appellant additionally maintains that a new trial should be granted because he was forced to use peremptory challenges to strike venire persons, who should have been excused "for cause," and he exhausted his peremptory challenges before the jury was seated. Specifically, Appellant alleges that: (1) Ronald Smith (Smith) repeatedly stated that he could not concentrate if selected as a juror, because of his mother's illness and business obligations; (2) Lynn Furr (Furr) was not allowed to be excused "for cause," although she had seen media reports concerning the case; had a child, who was a carrier for the Morning Call (as was Schmoyer); knew pastors at the church attended by Schmoyer; and doubted her ability to remain impartial; (3) Ann Taglang (Taglang) was not allowed to be excused "for cause," although she demonstrated a fixed opinion that a death sentence should be given in the event of a conviction for first-degree murder; (4) Susan Rosen (Rosen) was not allowed to be excused "for cause," although she was a therapist treating rape victims and indicated it would be difficult for her to remain impartial; and (5) Dr. Michael Zager (Zager) was not allowed to be excused "for cause," although he was a medical doctor, who expressed "specific hardship concerns," and was professionally acquainted/associated with the two forensic pathologists, who were expected to (and did) testify at trial.

The test for determining whether a prospective juror should be disqualified is whether he or she is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence. *See Commonwealth v. Lane*, 521 Pa. 390, 555 A.2d 1246, 1249 (1989); *Commonwealth*

*v. Colson,* 507 Pa. 440, 490 A.2d 811, 818 (1985),[39] *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2245, 90 L.Ed.2d 692 (1986). This decision rests within the sound discretion of the trial court, must be based upon the juror's answers and demeanor, and will not be reversed "in the absence of a palpable abuse of this discretion." *Commonwealth v. Lewis,* 523 Pa. 466, 567 A.2d 1376, 1380 (1989); *see also Lane,* 555 A.2d at 1249.

"Jurors should be disqualified for cause when they do not have the ability or willingness to eliminate the influences under which they are operating and therefore cannot render a verdict according to the evidence." *Commonwealth v. Impellizzeri,* 443 Pa.Super. 296, 661 A.2d 422, 427 (1995), *appeal denied,* 543 Pa. 725, 673 A.2d 332 (1996) (citing *Commonwealth v. DeHart,* 512 Pa. 235, 516 A.2d 656, 663 (1986), *cert. denied,* 483 U.S. 1010, 107 S.Ct. 3241, 97 L.Ed.2d 746 (1987)). Thus, "[a] challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses that the court will presume a likelihood of prejudice or demonstrates a likelihood of prejudice by his or her conduct and answers to questions." *Colson,* 490 A.2d at 818.

The challenge of a juror for cause is addressed to the trial judge, and much weight must be given to his judgment in passing upon it. In exercising his discretion as to the fitness of a juror to serve, he has the juror before him, and much latitude must be left to him; and the weight to be given to the answers of a juror when examined on his voir dire is not to be determined exclusively by his words as we read them in the printed record. They are first to be weighed by the trial judge who sees and hears the juror, and, in the exercise of a wide discretion, may conclude that he is not competent to enter the jury box for the purpose of rendering an impartial verdict, notwithstanding his words to the contrary....

*Commonwealth v. Sushinskie,* 242 Pa. 406, 89 A. 564, 565 (1913). "The burden of proving that a venireman should be

---

**39.** *Abrogated on other grounds by Commonwealth v. Burke,* 566 Pa. 402, 781 A.2d 1136 (2001).

excused for cause is on the challenger who must demonstrate that he or she possesses a fixed, unalterable opinion that would prevent him or her from rendering a verdict based solely on the evidence and the law." *(James) Smith,* 540 A.2d at 256.

The defendant in *Colson* argued that a prospective juror should have been excused "for cause" because she "had ties to the victim's and prosecutor's families and prosecution witnesses." 490 A.2d at 818. Indeed, this venire person: (1) knew the victim's mother, who had taught her son in school approximately four years before the trial; (2) was acquainted with a prosecution witness, who discovered the body of the victim; (3) knew the wife of the state trooper, who was the prosecuting officer; and (4) believed that her husband may have been employed by the victim before her marriage. *Id.* Moreover, four years before the trial, an attorney who was associated with the prosecutor's father had settled the estate of her mother. *Id.* Relying on the testimony of the venire person that she did not have close relationships with any of these people, this Court approved a denial of a "for cause" challenge, finding these relationships to be remote in nature. *Id.* at 818–19. We also specifically noted that the venire person testified that these associations would not influence her decision. *Id.* at 818 (stating that "[a] remote relationship to an involved party is not a basis for disqualification where a prospective juror indicates during *voir dire* that he or she will not be prejudiced").

In *Commonwealth v. Patterson,* 488 Pa. 227, 412 A.2d 481 (1980), we found that a mistrial should not have been granted because of a relationship between a juror and a Commonwealth witness. There, on the fourth day of trial, the prosecution introduced the testimony of a police officer concerning the investigation of the crimes at issue. *Id.* at 485. The next morning, one of the jurors informed the trial court that he recognized the officer as someone he had seen at Mass, but did not know the officer's name. *Id.* The juror also told the court that he had never spoken to this officer and that their

encounters would in no way influence his ability to reach a fair and impartial verdict. *Id.*

 The record reveals that all potential jurors Appellant mentions indicated that they could follow the instructions from the trial court in delivering a fair and impartial verdict based on the evidence of the case. The fact that they may have responded equivocally during some of the questioning does not automatically require them to be excused "for cause." Although Appellant also complains of "inconsistent" decisions by the trial court because jurors in allegedly similar positions were treated differently,[40] we will not address those arguments. Such contrasting inquiries would have us delve into the discretionary judgment of the trial judge, who, having seen and heard the prospective jurors through the *voir dire* in person, is in the best position to make rulings in such matters. *See Lewis, supra; Lane, supra.*

 Turning to the specific allegations made by Appellant, Smith indeed expressed difficulty in serving on the jury, because of his mother's illness and business obligations. N.T., 10/10/1994, pp. 301–02. However, Smith also testified that: (1) his mother's illness would not prevent him from rendering a fair and impartial verdict; and (2) his ability to concentrate during the trial would only "possibly" be affected by his mother's illness. N.T., 10/10/1994, p. 298. Smith additionally stated that, despite his familiarity with the case from newspaper accounts, he would be able to render a fair and impartial verdict. N.T., 10/10/1994, pp. 296–97. It appears that the trial court did not feel that Smith expressed a sufficient hardship to be excused from jury duty. N.T., 10/10/1994, pp. 303–04.

**40.** For instance, Appellant maintains that the trial court excused several venire persons, who indicated arguably similar or even less onerous hardships than Smith, and dismissed another prospective venire person, whose daughter was a paper carrier for the Morning Call, because of his reaction to the case, while refusing to grant a challenge "for cause" on the same ground in relation to Furr. He also alleges that the trial court refused to strike Dr. Zager "for cause" due to his professional obligations, while automatically excusing another medical doctor from the jury pool, because of the "undue hardship" exception.

■ Appellant is correct in pointing out that Furr had seen media reports concerning the case; had a child, who was a carrier for the Morning Call (as was Schmoyer); and knew the pastors at the church attended by Schmoyer. However, none of these observations offers much assistance to his cause.

■ Initially, we note that mere exposure to media reports does not render a prospective venire person unable to sit on the jury. *See Commonwealth v. McGrew*, 375 Pa. 518, 100 A.2d 467, 470 (1953) (observing that "[t]he fact that a juror has read or heard about a case and has an impression or an opinion, or a prejudice is not ground for rejection for cause if he testifies and the Court believes that his opinion is not fixed and that he can and will make up his mind solely from the evidence which will be presented at the trial of the case").

Admittedly, Furr stated that she had an "emotional response" to what happened to Schmoyer, who was a Morning Call carrier, because her son was once a carrier for this paper and she worried about him. N.T., 10/12/1994, pp. 871, 881. However, Furr testified that she did not have a fixed opinion about Appellant's guilt or innocence. *Id.* at 872–73, 883. She also later stated: "I don't think that I have reacted differently or with more of a fixed opinion than any other parent" and further characterized her response to the Schmoyer homicide as a "reaction … much the same as any parents would be." *Id.* at 883.

Although Furr acknowledged knowing the pastors at the church attended by Schmoyer, who were also involved in Schmoyer's funeral service, she testified to having "no personal involvement" in the matter. N.T., 10/12/1994, p. 884. We fail to see how this association amounts to "a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses" to provide a basis for disqualification "for cause." *Colson*, 490 A.2d at 818.

Finally, citing to the transcript of the *voir dire*, Appellant argues that Furr questioned her own ability to remain impartial. *See* Brief for Appellant, p. 50. This is simply not the case. Rather, Appellant is mischaracterizing the record—

Furr did not express concerns about her ability to remain impartial; she testified that she "would not react favorably to graphic photographs of murdered persons" and "would [likely] have an emotional response to that." N.T., 10/12/1994, p. 893. As the trial court observed, "[Furr also] stated that [despite the graphic photographs] she would ... try to focus on the information and weigh it fairly and that she could not imagine that a possible 'emotional reaction to graphic details' of the photographs would be very uncommon." Trial Court Opinion, p. 24; N.T., 10/12/1994, p. 894.

In relation to Taglang, Appellant maintains that she demonstrated an uncompromising opinion that a death sentence should be given in the event of a conviction for first-degree murder. A review of her entire testimony, however, belies this assertion.

Initially, Taglang stated that she thought she could be fair and impartial in deciding the case and that she had no religious, moral, or philosophical beliefs that might impair her abilities in that regard. N.T., 10/17/1994, p. 1835. Thereafter, Taglang testified that, if Appellant was guilty of a homicide, the penalty should only be death. *Id.* at 1841–42. At one point, in response to the question posed by the trial court— "Do you have a pretty fixed opinion that is somebody kills somebody, that person gets killed?"—Taglang answered, "Yes, I do. Yes, I do." *Id.* at 1842.

However, the following exchanges took place later:

**Prosecutor:** All we're asking you to do is, can you put aside your personal beliefs and listen to what the aggravating circumstances are, listen to whatever the defense portrays as mitigating circumstances, and balance them? If you come to the conclusion that the aggravating circumstances outweigh the mitigating, then death is appropriate.

**Taglang:** (Nodded affirmatively.)

**Prosecutor:** On the other hand, what the defense counsel wants to know is whether or not if you conclude that some of the mitigating circumstances that they may present, including age—and they may present something else, if they

so choose—if in fact the mitigating circumstances convince you they outweigh the aggravating, that you would consider life and follow the Court's instructions.

**Taglang:** (Nodded affirmatively.)

**Prosecutor:** Do you think—how do you feel your answer to that question would be?

**Taglang:** I guess I could. I could.

\* \* \*

**Prosecutor:** Can you put aside your personal beliefs and, one, decide the case on the evidence and, two, follow the Court's instructions with respect to the law?

**Taglang:** Yes

\* \* \*

**The Court:** Let me ask you, do you feel more comfortable now about what your role would be in deciding the death penalty or life imprisonment?

**Taglang:** Yes. Yes.

**The Court:** Do you think you could handle that, once you heard all the testimony? Could you put aside your idea of a life for a life, a tooth for a tooth? Could you put that aside? That may be okay for your personal views but it isn't the law of Pennsylvania. Could that be set aside?

**Taglang:** Yes.

N.T., 10/17/1994, pp. 1844–46, 1857–58. From the above transcript, it is clear that Taglang was properly "rehabilitated," as she ultimately testified that she could put aside her personal notions and follow the court's instructions in relation to the law, which is all that is required by law of a juror.

■ With respect to Rosen, Appellant contends that, because this venire person and her mother worked as therapists, who treated rape victims,[41] she had "situational affinity" that

41. Rosen indicated that her mother was a sex therapist who dealt with victims of rape and incest. N.T., 10/18/1994, pp. 1996–97. Rosen described her own work in three parts: (1) "school-based counseling dealing with teenagers of sexual abuse, physical abuse, suicide ideation, depression, pregnancy;" (2) assessments for teenagers and children in trouble with the law; and (3) out-patient therapy. *Id.* at 1997–98.

would "cloud her judgment and undermine her impartiality." Brief for Appellant, p. 52. Again, however, Appellant is overly selective in referring to the answers given by Rosen.

It is true that Rosen's immediate reaction to the news accounts was that Appellant was guilty. N.T., 10/18/1994, pp. 1968–70. Rosen also stated that because of her work with women who have been raped and sexually abused, "it **might** be hard for me to stay impartial." *Id.* at 1972–73 (emphasis supplied). Nonetheless, Rosen also testified that she would be able to follow the judge's instructions regarding burden of proof even through she already had a fixed opinion that Appellant was guilty and that the penalty phase of the trial would not affect her ability to look at and weigh all of the facts and make a determination of guilt or innocence. *Id.* at 1972; 1974–75. After the prosecutor and trial counsel explained the nature of the penalty phase proceedings, Rosen testified that she could impose a life sentence, if the mitigating circumstances outweighed the aggravating circumstances. *Id.* at 1980–81. Finally, when counsel for defense asked Rosen whether she would be able to put aside her fixed opinion about Appellant's guilt and "be able to fair and impartially judge the testimony that's coming in and render a fair and impartial verdict," Rosen responded as follows:

> I think in listening to the media, everyone always has a fixed opinion listening to what's on the news. So when we do come in here, I think we would have to realize it would all be different. You would be kind of starting fresh. But, so, see, I think I know what the right thing is to do. So I think I probably would do it. I would do it, I mean.

*Id.* at 1989–90. Hence, a fair reading of the *voir dire* transcript reveals that Rosen did not indicate a categorical bias as a result of her or her mother's profession and shows that she could put aside her personal views and be an objective juror.[42]

---

42. In support of his argument relating to Rosen, Appellant cites to *Commonwealth v. Perry,* 441 Pa.Super. 409, 657 A.2d 989 (1995). In that case, a venire person testified that the state trooper, who was characterized by the trial court as "the arresting and accusing police officer," was his best friend with whom he socialized approximately once a week. *Id.* at 990–91. The venire person also stated that: (1)

Appellant also argues that Dr. Zager should have been excused "for cause," because he was a medical doctor, who expressed "specific hardship concerns" about serving as a juror. Appellant contends that his counsel was ineffective for failing to challenge Dr. Zager "for cause," because he was professionally "acquainted and associated" with the two forensic pathologists, who were expected to (and did) testify at trial. Brief for Appellant, p. 52.

During his questioning, Dr. Zager stated that there were no "insurmountable" problems that would prevent him from being a juror and that, if selected, he would serve. N.T., 10/14/1994, pp. 1441, 1454. He also stated that there would be nothing that would keep him from concentrating on the case during the trial. *Id.* at 1454. Later, he added the following:

> I mean, I've been thinking for the last few minutes here, and weighing some of your questions from before about the hardship and that sort of thing, and I'm sort of increasingly hesitant at this point, if I can be honest, about the hardship that would be placed on my—the other physicians in my practice and that sort of thing, if that weighs in.

*Id.* at 1455. Additionally, Dr. Zager acknowledged that he knew Drs. Isadore Mihalakis and Wayne Ross—forensic pathologists, who were expected to testify during the trial— because he trained under both of them at one point for a brief period of time during his residency at Lehigh Valley Hospital (approximately two years before trial) and intermittently during the course of his practice. *Id.* at 1457–58. Dr. Zager acknowledged that his relationship with Drs. Mihalakis and

this state trooper was "an honorable man and that he had no doubts whatsoever about [the trooper's] veracity;" and (2) his personal experiences "would possibly" affect the evaluation of this trooper's testimony. *Id.* at 991. The trial court, however, refused the defendant's challenge "for cause," because the prospective juror also stated that he could remain impartial and assess the trooper's credibility "on the same standard as any other witness." *Id.* The Superior Court reversed, finding that the trial court should have "presumed a likelihood of prejudice" with regards to this venire person. *Id.* Aside from the fact that we are not bound by the decisions of the Superior Court, we note that the present situation does not disclose testimony even remotely similar to *Perry*.

Ross would make him tend to regard them in a friendlier manner, but he would try to remain objective. *Id.* at 1458–59. He also indicated that he would consider the testimony presented by both sides in an objective manner. *Id.* at 1447–48.

The above-cited testimony shows no evidence that Dr. Zager, his practice, or his patients would have incurred a hardship. Additionally, although Dr. Zager stated that he trained under the expert witnesses expected to testify at trial and interacted with them in his professional capacity, Dr. Zager also related that he could set aside his familiarity with the witnesses, remain objective, and form an opinion based on the evidence presented at trial. In light of these answers, we cannot presume prejudice because of Dr. Zager's connection to Drs. Mihalikis or Ross, especially given the remote nature of their relationship.[43]

In sum, given our deferential view of its decisions in this area of the law and the rationale explained above, we find that the trial court did not abuse its discretion in denying "for cause" challenges to these venire persons. *See Lane, supra; Colson, supra; Lewis, supra.*

■■■ Appellant also argues that he was deprived of a fair trial by the improper exclusion "for cause" of Lamar Cramsey (Cramsey), based upon his views with respect to the death penalty. Appellant maintains that although Cramsey expressed conscientious scruples against the death penalty, he ultimately indicated that he could consider the death penalty in an appropriate case.

As we have often recognized, a prospective juror may be excluded "for cause" when his views on capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with the instructions given by the trial judge and the juror's oath. *See Bridges*, 757 A.2d at

---

43. In light of this reasoning, Appellant's argument that his counsel was ineffective for failing to challenge Dr. Zager "for cause," because of his relationship with the Commonwealth witnesses, fails. *See Commonwealth v. (James) Johnson*, 527 Pa.118, 588 A.2d 1303, 1305 (1991) (counsel's assistance deemed constitutionally effective once it is determined that the underlying claim is not of arguable merit).

873; *Commonwealth v. Stevens,* 559 Pa. 171, 739 A.2d 507, 521 (1999). Presently, we do not need to delve into the substantive analysis of the trial court's decision, however, for even assuming *arguendo* that the trial court erred in excluding Cramsey "for cause," such error was harmless in light of the fact that the Commonwealth had several peremptory challenges left after the jury was selected. If Cramsey not been struck "for cause," the Commonwealth could have peremptorily removed this juror with its remaining challenges. *See Lewis,* 567 A.2d at 1381. For this reason, Appellant is entitled to no relief on this argument.

■■■ 'In his final claim relating to the *voir dire* process, Appellant argues that his counsel was ineffective for "improperly, and without legal justification, conced[ing] on several occasions that the crimes 'quite frankly' were first degree murders." Brief for Appellant, p. 55. Although contending that this supposedly detrimental conduct took place on multiple occasions, in support of his argument, Appellant cites only to "NT 10/19/94, p. 254." This citation is erroneous, however, as the pages of the transcript from October 19, 1994, number from 2316 through 2635. Moreover, the alleged statement made by the defense counsel also does not appear on pages 2354, 2454, 2554, the 254th page of the transcript from October 19th, or the 254th page of the entire *voir dire* record.[44] Thus, we are unable to substantiate Appellant's argument.

Nonetheless, we have discovered that on multiple occasions during *voir dire,* counsel for Appellant made references to the fact that the Commonwealth was seeking a conviction on the charge of first-degree murder and that there were special penalty proceedings associated with such a conviction. *See, e.g.,* N.T., 10/19/1994, pp. 2566–67. By way of these references, counsel for Appellant began questioning prospective jurors about their feelings and potential prejudices concerning capital punishment. We believe that such statements were entirely proper within the context of this case.

44. Overall, the notes of *voir dire* in this case span over 2800 pages.

## 2. Guilt Phase

### a. DNA Evidence

Appellant contends that his trial counsel was ineffective with respect to the DNA testimony of Commonwealth experts by not introducing evidence or cross-examining them with respect to the existence and acceptance of alternative statistical models. Specifically, Appellant contends that his counsel should have raised specific questions concerning: (1) the witness' reliance on the "product rule" analysis of the DNA evidence; and (2) the impact of population substructuring and the use of the "ceiling principle" in statistical analysis of DNA evidence.

■ Six years ago, in *Commonwealth v. Blasioli*, 552 Pa. 149, 713 A.2d 1117 (1998), this Court observed that, in relation to the application of the so-called "ceiling principle" to DNA analysis, which accounted for the phenomena of population substructuring, "the controversy over the use of the product rule has been sufficiently resolved," in that "substructuring does not impact significantly upon DNA population frequency estimates." *Id.* at 1126. We recognize that at the time of Appellant's trial, the debate surrounding the effect of population substructuring on DNA statistical analysis was still ongoing. However, we agree with the trial court's analysis and, therefore, find no error in the way it addressed this claim.

First, nothing in Appellant's brief even hints at showing that the use and application of the "ceiling principle" could generate results that would "have thrown into question the testimony of the Commonwealth witnesses." Trial Court Opinion, p. 43. Second, contrary to Appellant's allegations, his trial counsel extensively cross-examined the Commonwealth expert witnesses, testing the validity of their testimony,[45] N.T., 11/1/19944, pp. 1415–58, 1464–68, 1488–93, and, specifically, brought out the existence of the "ceiling principle" method of statistical analysis of DNA samples, N.T., 11/1/1994, p. 1415. Third, counsel for Appellant exploited the variance in the

---

45. Similarly, during direct examination, the prosecutor brought out the fact that some scientists criticized the statistical methods used by the FBI laboratory. N.T., 10/31/1994, pp. 1284–89.

probability analysis of the DNA samples in his closing argument. N.T., 11/8/1994, pp. 2239–40. Accordingly, this ineffectiveness argument fails.

### b. Sam–Cali

■ On appeal, Appellant presents a number of claims relating to Denise Sam–Cali, who testified about her assault in the early morning hours of June 29, 1993, the subsequent break-ins at her house, and Appellant's apprehension. Initially, he argues that the trial court erred in allowing Sam–Cali to testify, because this allowed evidence of prior bad acts and uncharged criminal conduct to be introduced to the jury. Appellant maintains that Sam–Cali was not a witness to any of the charged offenses and, yet, provided "lurid and inflammatory" testimony, linking Appellant to these incidents. Brief for Appellant, p. 56. Appellant also claims that his counsel was ineffective for failing to: (1) object to this testimony; and (2) request a limiting instruction in relation to this evidence.

Initially, we note that Sam–Cali's testimony is admissible under the same principles supporting the joinder of the three homicides, i.e., to establish the identity of the perpetrator, his motive, intent, and a common criminal scheme. *See Elliott, supra; Miller, supra; Hughes, supra.* Furthermore, such testimony would be allowed under the *"res gestae"* exception to the rule against admission of evidence of prior crimes. As we explained in *Commonwealth v. Lark (Direct Appeal),* 518 Pa.290, 543 A.2d 491 (1988),

> Evidence of distinct crimes are not admissible against a defendant being prosecuted for another crime **solely** to show his bad character and his propensity for committing criminal acts. However, evidence of other crimes and/or violent acts may be admissible in special circumstances where the evidence is relevant for some other legitimate purpose and not merely to prejudice the defendant by showing him to be a person of bad character.... [One such] special circumstance where evidence of other crimes may be relevant and admissible is where such evidence was part of the chain or sequence of events which became part of the

history of the case and formed part of the natural development of the facts. This special circumstance, sometimes referred to as the *res gestae* exception to the general proscription against evidence of other crimes, is also known as the complete story rationale, i.e., evidence of other criminal acts is admissible to complete the story of the crime on trial by proving its immediate context of happenings near in time and place.

*Id.* at 497 (emphasis in original, internal citations omitted). In the present case, the incidents at the Sam–Cali residence are intricately interwoven with the three homicides in question. The initial assault on Sam–Cali took place approximately two weeks before the Fortney homicide and Sam–Cali's testimony provided the jury with a "complete story" of Appellant's criminal spree from the Burghardt homicide in August of 1992 to Appellant's capture in July of 1993. In sum, as the trial court explained, "Sam–Cali's testimony was not offered merely to indicate [Appellant]'s propensity to commit similar crimes ... but to show he committed these crimes charged, how he committed them, why he committed them and the circumstances of his apprehension." Trial Court Opinion, p. 32.

■ We also reject the ineffectiveness arguments raised by Appellant in relation to this substantive claim. First, Appellant's counsel objected to Sam–Cali's testimony on several occasions, on the basis that it was prejudicial, because it allowed the jury to consider evidence of other crimes perpetrated by Appellant. *See* N.T., 11/3/1994, pp. 1918–21, 1965. Second, while counsel for Appellant did not ask for a limiting instruction in relation to Sam–Cali's testimony, such request would have been (at best) redundant, as it appears that the trial court asked if such an instruction was required and, after receiving an affirmative response from the prosecutor, in fact, instructed the jury as to the limited purpose of this evidence. *See* N.T., 11/3/1994, pp. 1919–21, 1965–66. The trial court again cautioned the jurors about the limited use of Sam–Cali's testimony during the final jury instructions. *See* N.T., 11/8/1994, pp. 2279–2280.

■ In relation to Sam–Cali, Appellant also argues that, in violation of its duty under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to reveal exculpatory evidence, the Commonwealth failed to disclose that, during her initial interviews with the police, Sam–Cali "told the Allentown police that her assailant ... was Saul Rosado," whom she knew and previously employed for about one month. Brief for Appellant, p. 67.

"A *Brady* violation comprises three elements: (1) suppression by the prosecution (2) of evidence, exculpatory or impeaching, favorable to the defendant, (3) to the prejudice of the defendant." *Commonwealth v. Paddy,* 569 Pa. 47, 800 A.2d 294, 305 (2002). Contrary to Appellant's claim, Sam–Cali did not identify Rosado as her assailant, but merely named him as a possible lead for the police to pursue, because Sam–Cali thought that he might have had a motive to harm her. After Sam–Cali told police about Rosado, he was interviewed and dismissed as a suspect, because: (1) having a full beard, tattoos, and long hair, Rosado did not match the description of the assailant that Sam–Cali gave during her initial interviews; and (2) Sam–Cali said that Rosado was not her assailant after looking at his picture. Simply put, this evidence could not have been exculpatory.

■ Moreover, prior to this trial, Appellant had already pled guilty to multiple crimes (including burglary, aggravated assault, and attempted homicide) in relation to the incidents at the Sam–Cali residence in June and July of 1993. Accordingly, Appellant admitted to perpetrating these crimes. *See, e.g., Commonwealth v. Anthony,* 504 Pa. 551, 475 A.2d 1303 (1984) (observing that "[a] guilty plea is an acknowledgement by a defendant that he participated in the commission of certain acts with a criminal intent ... [and, thus, h]e acknowledges the existence of the facts and the intent"); *Commonwealth v. Papy,* 436 Pa. 560, 261 A.2d 580 (1970) (noting that the circumstances of the case fell within a rule of law that "a [defendant's] plea constitutes an admission of his guilt and all of the facts averred in the indictment"); *see also Commonwealth ex rel. Walls v. Rundle,* 414 Pa. 53, 198 A.2d 528, 529 n.

1 (1964). Therefore, Appellant could not impeach Sam–Cali on the basis that she gave the police the name of another possible suspect during her initial interviews. Hence, because the evidence at issue was neither exculpatory nor tended to impeach another, there was no *Brady* violation.

■ Additionally, in light of the above-mentioned article in the Ladies' Home Journal,[46] Appellant argues that his counsel was ineffective because he failed to cross-examine Sam–Cali "with regard to any financial bias, receipt of financial incentives from the magazine, [and] the existence of any other book or magazine deals." Brief for Appellant, p. 70. As mentioned earlier, prior to the trial, Appellant pled guilty to a slew of criminal charges concerning the incidents at Sam–Cali's residence that took place in the summer of 1993. Therefore, irrespective of any financial gain Sam–Cali may have received from the article in the Ladies' Home Journal, given Appellant's admissions, the veracity of her testimony could not have been undermined in the manner presently suggested by Appellant. If anything, rigorous cross-examination of Sam–Cali on this issue would have been counter-productive to Appellant's cause. Hence, this ineffectiveness claim fails.

■ Appellant also argues that a new trial should be granted because the Commonwealth was allowed to introduce testimony from Sam–Cali and two police officers concerning Appellant's apprehension. As we noted, Appellant pled guilty to the charges concerning the episodes at Sam–Cali's residence, including the events surrounding his apprehension. As we have also stated, these incidents were an integral part of the facts that provided the basis of Appellant's convictions. Accordingly, this evidence was properly introduced and Appellant is not entitled to any relief.[47]

46. *See also* note 35, *supra.*

47. Once more, we note that the trial court cautioned the jurors about the limited nature of the testimony concerning Appellant's apprehension at the time the testimony was presented and, again, during its final instructions. *See* N.T., 11/3/1994, pp. 1955–56; N.T., 11/8/1994, pp. 2279–80.

### c. Hypnosis

Appellant presents a number of arguments in relation to the hypnosis of Denise Sam–Cali and James Stengel (Stengel), who testified against him during the trial. The substantive claims relating to these witnesses are similar. First, Appellant contends that his counsel was ineffective by allowing the testimony of these witnesses to be introduced without the requirements regarding the introduction of testimony of a hypnotized witness being met. Second, he alleges that the defense was never told that these witnesses were hypnotized. Finally, Appellant urges that, by failing to disclose that Sam–Cali and Stengel were hypnotized, the Commonwealth violated the dictates of *Brady, supra.*

■ We will initially address the Commonwealth's purported failure to disclose the hypnosis of the witnesses at issue. Following his arrest, on August 4, 1993, a letter from the Commonwealth notified Appellant that Sam–Cali underwent hypnosis during the investigation.[48] Appellant signed for the letter and admitted receiving it.[49] N.T., 11/24/98, pp. 76–77. As it relates to the hypnosis of Stengel, during the post-sentencing hearing, Appellant's counsel, Carmen Marinelli, explicitly testified that during the pre-trial stages of this case, he was informed that Stengel was hypnotized. N.T., 11/13/1998, pp. 36–37. Given these facts, it is clear that, prior to trial, the Commonwealth indeed disclosed to the defense that two of its potential witnesses were hypnotized and there was no *Brady* violation.

■ As explained above, in a related claim of counsel ineffectiveness, however, Appellant asserts that, even if this Court finds that the Commonwealth gave prior notice to the

---

**48.** The letter was sent to the Lehigh County Prison.

**49.** Appellant claims that he did not understand the contents or significance of the letter and, accordingly, did not discuss it with his attorneys. N.T., 11/24/98, pp. 76–77. However, Appellant's failure to communicate this information to his counsel, due to an alleged misunderstanding of the letter's importance, cannot be imputed to the Commonwealth's duty under *Brady* to disclose evidence favorable to the accused, because, *inter alia,* in the present case they did just that.

trial court concerning hypnosis, his counsel was ineffective "for failing to request and require that the trial court follow through with the balance of the [so-called] *Smoyer* requirements." Brief for Appellant, p. 69.

In *Commonwealth v. Smoyer*, 505 Pa. 83, 476 A.2d 1304 (1984), this Court held that where a party seeks to introduce the testimony of a witness, who has previously been hypnotized that party is to: (1) advise the court of the existence of the hypnosis; (2) show that the testimony to be presented was established and existed prior to the hypnosis; and (3) demonstrate that the hypnotist was trained in the process and was neutral. In turn, the court must instruct the jury that the witness had been hypnotized and that they should receive the testimony with caution.

Although it is true that no separate hearing took place in relation to the witnesses, who were hypnotized during the investigation, we are unable to conclude that Appellant is entitled to any relief on this ground, because it appears that all of the *Smoyer* guidelines were satisfied. Initially, the trial transcript reveals that prior to calling Sam–Cali and Stengel to the stand, the Commonwealth advised the court that these witnesses underwent hypnosis, offering to submit the tape recordings of the hypnotic sessions. *See* N.T., 10/31/1994, pp. 1136–1145; N.T., 11/3/1994, pp. 1963–64.[50] Thus, we believe that the first *Smoyer* guideline was unambiguously satisfied in relation to both witnesses.

In relation to the second *Smoyer* guideline, Appellant maintains that Sam–Cali's recollection changed after hypnosis, because, only thereafter was she able to remember being sexually assaulted during the initial attack on June 29, 1993. Thus, Appellant implies that if his counsel would have objected on this ground (which he did not), Sam–Cali's testimony may have been precluded.

**50.** In his brief to this Court, counsel for Appellant, contends that "[t]he District Attorney did not advise the [c]ourt of the hypnosis" of Sam–Cali. Brief for Appellant, p. 62. This assertion, however, is a falsehood, as it is plainly contradicted by the transcript. N.T., 11/3/1994, pp. 1963–64.

Irrespective of whether the assertion made by Appellant is, in fact, accurate, we note that the sexual nature of the attack on Sam–Cali was confirmed by independent, physical evidence. Moreover, by way of other testimony, the jury became aware that Sam–Cali was sexually assaulted on the night in question. Hence, the sexual nature of the attack on Sam–Cali was soundly established, related to the jury by other witnesses, and could not be disputed by Appellant. Thus, even if we assume: (1) counsel ineffectiveness (as suggested by Appellant) in this regard; or (2) error on the part of the trial court in failing to adhere to *Smoyer,* the introduction of this unequivocally truthful testimony was still harmless.

With respect to the second *Smoyer* guideline, Appellant alleges a change in Stengel's memory. As related earlier, Stengel was an employee of the City of Allentown, who worked at the Reservoir, where the body of Charlotte Schmoyer was discovered on June 9, 1993. Shortly after arriving at the Reservoir at 6:25 a.m. on June 9, 1993, he saw a vehicle in the parking area, approximately twelve feet from his own car. Mr. Stengel described this vehicle as a light blue, four-door sedan with damage to its right side. During his initial interview with the investigators, Stengel stated that he thought the vehicle was a "Dodge." N.T., 11/1/1994, pp. 1495–13.

On the basis of this initial interview, on June 13, 1993, Stengel underwent a hypnotic session with Oscar P. Vance, Jr. (Vance), the Chief County Detective of the Montgomery County District Attorney's Office. However, **immediately before undergoing hypnosis,** Mr. Stengel was extensively interviewed. During this interview, he was shown a catalogue, published by the National Auto Theft Bureau that compiled pictures of various automobiles. From this book, Stengel identified a Ford Tempo as the type of vehicle he saw at the Reservoir on the morning of June 9, 1993. *See* N.T., 7/16/1998, pp. 65–72.

Appellant attempts to undermine the testimony of several witnesses, who confirmed the timing of the identification, suggesting that the identification was the result of the hypnot-

ic session. We are unconvinced by these efforts—Stengel recognized the vehicle he saw on June 9, 1993, as a Ford Tempo, prior to his hypnosis.[51] Thus, Appellant's argument fails in its substance.

Turning to the third *Smoyer* guideline, the Commonwealth revealed to the trial court that Detective Vance hypnotized both witnesses. Defense counsel did not dispute the "neutrality" of the hypnotist. Presently, however, while not attacking his professional qualifications, Appellant maintains that Detective Vance was not "neutral" because: (1) he is a law enforcement officer; (2) who offers his services to law enforcement clients; and (3) the interviews in question took place in the offices of the Montgomery County District Attorney's Office.

In *Commonwealth v. Romanelli*, 522 Pa. 222, 560 A.2d 1384 (1989), this Court stated:

> It is perhaps true that a hypnotist employed by the police cannot, by virtue of his employment, give the appearance of being as neutral as a private practitioner. We are, however, unwilling to formulate a *per se* rule that police hypnotists are not neutral, but instead, prefer to examine the facts of each case.

*Id.* at 1387 (finding the hypnotist neutral although he worked for the police department investigating the crime at issue). Aside from Appellant's bold (yet woefully unsubstantiated) assertions of bias, there is no evidence that Detective Vance was not "neutral" to the parties or the issues involved. Thus, especially here, where the hypnotist, aside from being a member of law enforcement community, is not related to the investigating officers and is from a different jurisdictional territory altogether, we will not find the presence of bias. Accordingly, we find that the third *Smoyer* guideline was satisfied and that Appellant's claim of counsel ineffectiveness fails because the substantive claim lacks merit.

51. We also note that Stengel correctly identified the model and described other unique characteristics (e.g., color, damage) of the vehicle more than a month before Appellant was apprehended. There is absolutely no evidence that Appellant was even a suspect at that time.

As it relates to the last *Smoyer* specification, despite a request by the prosecutor and the willingness of the trial court, it appears that defense counsel explicitly objected to any cautionary instruction given to the jurors in relation to the hypnosis. In fact, he did not want the fact that Sam–Cali and Stengel were hypnotized brought to the attention of the jury. The trial court obliged and gave no cautionary instruction in this regard. Given the actions of defense counsel, we cannot find that any trial error occurred.

Moreover, with regard to the ineffectiveness claim, Appellant has failed to explain how the outcome of the proceedings would have been different if trial counsel had not refused the cautionary instruction. Accordingly, Appellant has not established prejudice under the *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987), standard governing ineffectiveness claims and Appellant will not be granted relief on his claim that trial counsel was ineffective for failing to request a cautionary instruction.

### d. Admission of Physical Evidence

Appellant challenges a number of items of physical evidence introduced by the Commonwealth. We will address them by kind.[52]

### i. Photographs

It has been a steadfast principle of our jurisprudence that pictures of the victim are not *per se* inadmissible. *See Commonwealth v. King*, 554 Pa. 331, 721 A.2d 763, 773 (1998), *cert. denied*, 528 U.S. 1119, 120 S.Ct. 942, 145 L.Ed.2d 819 (2000); *Commonwealth v. Marinelli*, 547 Pa. 294, 690 A.2d 203, 216 (1997), *cert. denied*, 523 U.S. 1024, 118 S.Ct. 1309, 140

---

**52.** We note that, although on many occasions Appellant's trial counsel explicitly objected to the introduction of the physical evidence in question, Appellant makes "boilerplate" counsel ineffectiveness claims in relation to **every** piece of evidence discussed in this section. *See* Brief for Appellant, pp. 74–83. In light of our findings that the trial court did not err in its decisions, Appellant is not entitled to relief on any of his counsel ineffectiveness claims connected to the physical evidence discussed in this section of the opinion. *See (James) Johnson, supra.*

L.Ed.2d 473 (1998); *Commonwealth v. Chester*, 526 Pa. 578, 587 A.2d 1367, 1373, *cert. denied*, 502 U.S. 959, 112 S.Ct. 422, 116 L.Ed.2d 442 (1991). In relation to admissibility of these photographs, we have promulgated the following test:

> [A] court must determine whether the photograph is inflammatory. If not, it may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the trial court must decide whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors. If an inflammatory photograph is merely cumulative of other evidence, it will not be deemed admissible.

*Marinelli*, 690 A.2d at 216 (citing *Chester*, 587 A.2d at 1373–74); *also see Freeman*, 827 A.2d at 405; *Commonwealth v. Baez*, 554 Pa. 66, 720 A.2d 711, 726 (1998), *cert. denied*, 528 U.S. 827, 120 S.Ct. 78, 145 L.Ed.2d 66 (1999). "The admissibility of photos of the corpse in a homicide case is a matter within the discretion of the trial court, and only an abuse of discretion will constitute reversible error." *Rush*, 646 A.2d at 560. As we also explained in *Rush*:

> A criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are merely consonant with the brutality of the subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt. Further, the condition of the victim's body provides evidence of the assailant's intent, and, even where the body's condition can be described through testimony from a medical examiner, such testimony does not obviate the admissibility of photographs.

*Id.* (citing *Commonwealth v. McCutchen,* 499 Pa. 597, 454 A.2d 547, 549 (1982)).

Presently, Appellant contends that the trial court erred in allowing into evidence: (1) a photograph showing Burghardt's body in the position it was found by the police;[53] (2) various pictures of Schmoyer's body and the surrounding crime scene; (3) a photograph of Schmoyer's neck and cheek area; (4) various color photographs of Fortney's body and the surrounding crime scene; (5) photographs of Sam–Cali, showing her condition after the attack on June 28, 1993; and (6) photographs of injuries sustained by Appellant during his apprehension. Appellant argues that the introduction of these photographs was merely cumulative of the testimony adduced at trial and that the prejudicial effect of these pictures outweighed their probative value.

Having reviewed the photographs at issue, we cannot conclude that the trial court abused its discretion in determining that their evidentiary value outweighed any possible prejudicial effect. Appellant is correct in pointing out that: (1) the victims' wounds and blood splatter were visible on some of the pictures; and (2) several Commonwealth witnesses testified as to the locations of the bodies and the nature of the crime scenes in question. We note, however, that neither this testimony nor the gruesome nature of the pictures is an impediment to the admissibility of photographs of the homicide scene. *See, e.g., Marinelli,* 690 A.2d at 217 (commenting that "[w]hile the presence of blood on the victim depicted in the photographs is unpleasant, it is not in and of itself inflammatory"); *Rush,* 646 A.2d at 559–60 (holding that the pictures of the victim's body at the crime scene were admissible despite testimony from a medical examiner); *Com-*

---

**53.** Appellant specifically identifies this picture as "Commonwealth Exhibit # 4." Brief for Appellant, p. 72. Appellant also argues that the trial court erred in allowing the Commonwealth to introduce the various color photographs of Burghardt's body and the surrounding crime scene. However, Appellant does not specifically refer to any such photographs in his brief. We also note that the trial court opinion addresses only the allegedly erroneous admission of "Commonwealth Exhibit # 4."

*monwealth v. Gorby*, 527 Pa. 98, 588 A.2d 902, 908 (1991) (finding no abuse of discretion in allowing photographs, "which depicted a large gaping gash on the victim's neck as well as thirteen other knife wounds located on the victim's hands, arms back and chest"); *Chester*, 587 A.2d at 1373–74 (finding no abuse of discretion in allowing photographs of the victim's slashed throat, open eye, and other head injuries as evidence of a specific intent to kill). We also note that the trial court limited the time that the jury was allowed to observe the pictures. *See* Trial Court Opinion, p. 41

Further, we believe that the trial court adequately explained the basis for the introduction of these photographs:

[A] photograph of Burghardt did not show her face or injuries, only the positioning of the body when the police arrived. The photographs of Schmoyer showed the collection of logs and leaves used to cover her body demonstrating the method, and thus the intent, to cover up the murder. The photographs of her back and top part of her sweatshirt demonstrated the violent, torturous attack upon her, again reflecting the intent of her assailant. The photograph of Schmoyer's cheek portrayed the pattern injury which was later determined to have been caused by a sneaker. It was used in conjunction with the testimony regarding footwear impressions to compare the pattern injury reflected on the photograph with the impression made by the sneaker found at [Appellant]'s home. A photograph was cropped so that the gaping neck wound was not observable. Photographs of the Fortney crime scene demonstrated the intent and malice used to kill her. Finally, the photographs of Sam–Cali again demonstrated the brutality of the assault which could be compared with the brutality used in the other cases, particularly as to Fortney. While none of these photographs was pleasant to view, each of them had a proper role to play in explaining to the jury the common brutality and intent to kill.

Similarly, photographs of [Appellant]'s injuries when he was apprehended were neither prejudicial nor irrelevant. They bolstered the Commonwealth's version of [Appellant]'s cun-

ning and resolve in making his exit from the homes of his victims.

Trial Court Opinion, pp. 40–41 (internal citation omitted).

### ii. Audiotapes

■ Appellant also contends that the trial court erroneously allowed the Commonwealth to introduce various tape recordings of 911 telephone calls and police transmissions.[54] As the trial court observed, these tapes did not contain any inflammatory screams or impassioned exclamations, and, while they may have been somewhat cumulative, were certainly not prejudicial. *See* Trial Court Opinion, p. 41. We find no error in the way the trial court ruled on these issues.

### iii. Videotapes

■ Additionally, Appellant argues that the trial court erred in allowing the Commonwealth to present a videotape of Schmoyer's newspaper delivery route and a videotape of the Schmoyer crime scene. Again, however, we find no abuse of discretion in the trial court's rulings. For instance, the silent videotape of the newspaper delivery route was relevant to show the residential neighborhood from which Schmoyer was abducted, because it resembled the locale where each of the other homicides and the attacks on Sam–Cali took place. The videotape of the crime scene was important, because it showed the "blood trails" left by Appellant, who was injured during the attack. The samples taken from these "trails" were later used in the comparative analysis of the DNA evidence.

### iv. Evidence Removed from Appellant's Residence

Appellant also contends that the trial court erred in allowing the Commonwealth to introduce physical evidence relating to

---

**54.** Appellant specifically references: (1) an audiotape recording of the call that Burghardt's neighbor made to the Allentown Police Department on August 9, 1993; (2) audiotape recordings of the police transmissions after Burghardt's body was discovered; (3) audiotape recordings of the calls to and by the Allentown Police Department on June 9, 1993, in relation to Schmoyer's disappearance; and (4) audiotape recordings to and by the Allentown Police Department after Fortney's body was discovered.

the assault on Sam–Cali. It appears that the extent of Appellant's argument on this issue is his assertion that the incidents at Sam–Cali's residence were unrelated to the homicides in question. *See* Brief for Appellant, p. 83. Given that we have already rejected this argument, finding that these incidents completed the story of the criminal episode, the present claim fails as well.

### e. Testimony of Karen Schmoyer

During her direct testimony as a witness for the Commonwealth, Schmoyer's mother, Karen, was asked to recall what happened after she learned that her daughter was missing. Karen described herself as "[going] into a panic" and "very nervous ... I remember my mouth was very dry ... my hands were shaking." N.T., 10/26/1994, pp. 663–64. Appellant contends it was error for the trial court to have permitted this testimony regarding Karen's "feelings and thoughts" when she learned her daughter was believed to be missing, because it was not relevant or material to this case.

Even presuming that such testimony regarding "feelings and thoughts" was not relevant or material to the case, this testimony was limited and did not have the unavoidable effect of depriving Appellant of a fair and impartial verdict. *See, e.g., Commonwealth v. Begley,* 566 Pa. 239, 780 A.2d 605, 624 (2001); *Commonwealth v. Weiss,* 565 Pa. 504, 776 A.2d 958 (2001), *cert. denied,* 535 U.S. 1101, 122 S.Ct. 2303, 152 L.Ed.2d 1059 (2002). Accordingly, Appellant is not entitled to relief on this claim of trial court error. Additionally, to the extent Appellant attempts to raise a claim of trial counsel ineffectiveness for failure to object to the admission of Karen Schmoyer's testimony, he fails to explain how trial counsel's strategy was unreasonable or how he was prejudiced by counsel's failure. *Pierce, supra.*

### f. Testimony of Jean Vas

Jean Vas, an emergency paramedic, who responded to the Fortney residence after the discovery of the victim's body, described the crime scene as "very, very brutal and gruesome, and I've seen a lot of deaths over the years." N.T., 11/2/1994,

p. 1684. Appellant contends that this testimony was prejudicial and that his counsel was ineffective for failing to raise an objection to this statement. Again, however, we agree with the trial court reasoning in this regard—the testimony was part of a long description of the crime scene at the Fortney residence and was necessary to establish the element of intent. For this reason, we reject the substantive argument and the counsel ineffectiveness claim raised by Appellant in relation to this testimony.

### g. Testimony of Lt. Dennis Steckel

Appellant contends that the testimony of Lt. Dennis Steckel (Steckel), who identified his employer as the Allentown Police Department Youth Division, that he was familiar with Appellant, knew what school Appellant attended, and where Appellant resided in 1984 and 1986, was prejudicial because it would allow the jury to infer that Appellant had engaged in prior criminal activity as a juvenile. Additionally, Appellant argues that his counsel was ineffective for failing to object to this testimony. In support of his argument, Appellant cites to *Commonwealth v. Groce*, 452 Pa. 15, 303 A.2d 917, *cert. denied*, 414 U.S. 975, 94 S.Ct. 290, 38 L.Ed.2d 219 (1973), where this Court found prejudicial error when a police officer, while testifying for the Commonwealth, revealed that he came across defendant's nickname during prior investigations and discovered his last name after searching through the police files. *See* 303 A.2d at 918.

Unlike *Groce*, however, there was no indication that Lt. Steckel was familiar with Appellant through the performance of his duties or that Appellant's name was in the police files. We find the present circumstances more akin to *Commonwealth v. Carpenter*, 511 Pa. 429, 515 A.2d 531 (1986), where a witness, after identifying himself as a parole officer, testified about a conversation he had with the defendant. In *Carpenter*, we reasoned that:

[A] mistrial was not warranted and that little, if any prejudice accrued to appellant by this witness' passing reference to his occupation as a parole officer.

* * *

> [T]he mention of the witness' occupation as a parole officer and the fact that he knew the appellant did not convey to the jury, either expressly or by reasonable implication, the . fact of a prior criminal offense or record. Such an inference, while certainly **possible,** was most certainly not conveyed to the jury by the mere mention of the witness' occupation and the fact that he knew appellant, as there are an infinite variety of ways that appellant might otherwise know a person who was a parole officer.

*Id.* at 534–35 (emphasis in original). This analysis is equally applicable to the instant matter, as we believe that the mere reference to the witness' employment in conjunction with his familiarity with Appellant did not convey to the jury that Appellant had a prior criminal record as a juvenile. *See Carpenter, supra; Commonwealth v. Riggins,* 478 Pa. 222, 386 A.2d 520, 524 (1978) (To conclude that appellant had committed prior crimes from a detective's single statement that he knew where appellant lived, the jury would have to indulge in gross speculation). Therefore, we reject the claims Appellant has asserted in reference to the testimony of Lt. Steckel.

### h. Testimony of Latanio Fraticeli

At one point during the trial, the Commonwealth considered calling as a witness an eight-year-old girl, Latanio Fraticeli (Fraticeli). Before she testified, however, the trial judge, without revealing the identity of the witness, called for a recess, explaining in the presence of the jury that he wanted "to talk to the little girl a little bit first, see if I can put her at ease a little bit. She is very shy." N.T., 11/2/1994, p. 1794. Thereafter, a separate proceeding was held, where the prospective witness gave specific identification testimony that would have implicated Appellant as the person who entered the Fortney home the night of the homicide. Ultimately, the Commonwealth decided not to call Fraticeli as its witness, *see* N.T., 11/2/1994, pp. 1810–1811, the parties agreed that the best course of action would be not to offer the jury any explanation for Fraticeli not having been called, and the jurors

were dismissed for the day. The next day, an article appeared in the newspaper about Fraticeli and her statements during the hearing. Defense counsel requested that jurors be examined as to whether any of them had read the article. The trial court refused, but, before the start of the proceedings, cautioned the jurors about staying away from the media coverage of the case.[55]

Presently, Appellant asserts that the explanation for the recess, given by the trial court, was unnecessary and unfair, "because it invite[d] ... speculation as to what the witness **may** have said ... drawing the focus away from what was ... being said from the witness stand." Brief for Appellant, p. 89 (emphasis in original). Thus, Appellant argues that the trial court erred in this regard. Further, Appellant contends that a new trial is warranted, because the trial court erred in refusing to inquire whether the jurors read the newspaper article concerning Fraticeli.

 Although the trial court's statement may have been unnecessary, we cannot conclude that Appellant was prejudiced—the remark did not reveal the substance of the witness' testimony, such as her identification of Appellant, and provided an acceptable explanation for the brief intermission in the proceedings. We are also not persuaded that this passing statement drew the jury's focus away from considering the evidence and testimony actually presented by the parties.

 Appellant is also not entitled to relief with regard to the trial court's refusal to question jurors about their knowledge of the newspaper article. In *Commonwealth v. Bruno*, 466 Pa. 245, 352 A.2d 40 (1976), this Court stated:

> The preferred procedure when highly prejudicial material is publicized during the trial and the jury is not sequestered is to question the jurors individually, out of the presence of the other jurors. However, questioning jurors as a group or

55. N.T., 11/3/1994, p. 1828.

giving special precautionary instructions may be sufficient precaution depending on the facts of the particular case. *Id.* at 52 (internal citations omitted).

The jurors were individually instructed during *voir dire* to avoid media coverage of the case. On the first day of the trial, the trial court again reminded the jurors to keep away from the media coverage of the trial and invited them to reveal if any such exposure already occurred. *See* N.T., 10/24/1994, p. 24.[56] The trial judge repeated its warning during his initial jury address. *See* N.T., 10/24/1994, pp. 32–33. Moreover, the trial court gave a cautionary instruction the morning after the article about Fraticeli was published, reiterating its earlier statements and instructing the jurors that they were required to determine the facts of the case based upon the evidence and testimony that they heard during the course of the trial. *See* N.T., 11/3/1994, p. 1828. Accordingly, we find that the trial court acted entirely within its discretion in refusing to *voir dire* the jurors, thus avoiding inadvertently notifying the jury of the contents of the article, and giving a sufficient precautionary instruction to secure the integrity of the trial. *Also see Commonwealth v. Crispell,* 530 Pa. 234, 608 A.2d 18, 22–23 (1992).

### 3. Penalty Phase

#### a. Mitigation Evidence

Appellant argues that trial counsel was ineffective for failing to introduce mitigation evidence during the penalty phase of the proceedings. In support of his argument, during the post-sentencing hearing, Appellant presented the testimony of several witnesses, who Appellant maintains could have testified on his behalf during the penalty phase.[57] Appellant alleges that he provided their names to his trial counsel or the

---

**56.** We note that the trial court's instruction on that day was prompted by the publishing of an article in the local newspaper about the trial and a TV report concerning DNA evidence. *See* N.T., 10/24/1994, p. 22.

**57.** Appellant alleges that each of the witnesses he names,

[C]ould have and would have testified to [his] good character ... the fact that [he] suffered from extreme mental or emotional disturbance, and that [he] had never been ... prone to the type of violence shown.

witness' identity was easily discoverable by way of a simple investigation. Additionally, Appellant presented over forty exhibits that he claims could have been used during the penalty phase.[58] Appellant argues that, collectively, this evidence would have established the presence of the "catch all" mitigating factor. *See* 42 Pa.C.S. § 9711(e)(8) (stating that "mitigating circumstances shall include ... [a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense").

We find that Appellant's argument is without merit. In sentencing Appellant in relation to the Fortney homicide, the jury found "family background and environment," "use of alcohol and drugs," and "school history," as mitigating circumstances. *See* Fortney Sentencing Verdict Sheet, p. 3. Because these factors are not explicitly set forth as mitigators in 42 Pa.C.S. § 9711(e), they fall within the "catch all" provision articulated in 42 Pa.C.S. § 9711(e)(8). Hence, the defense, in fact, established the presence of this mitigating factor. We cannot find trial counsel ineffective for achieving exactly what Appellant alleges that they failed to do—establishing the existence of the "catch all" mitigator. Consequently, the argument presented by Appellant fails.

### b. Photographs

During their penalty phase deliberation, the jury requested to see the pictures of the victims that were introduced by the Commonwealth during that phase of the proceedings.[59] N.T.,

Further, these same witnesses could and would have testified to the extremely difficult upbringing of [Appellant], and the extent to which [Appellant]'s addicted, abusive father caused him severe and disabling emotional disturbance. These same witnesses could have testified that [Appellant]'s step-father, with whom defendant had a close and nurturing relationship, abandoned [Appellant] and his family, as a result of which [Appellant] suffered further emotional disturbance. Brief for Appellant, p. 22.

58. For the most part, the exhibits are academic and athletic merit certificates Appellant received while in placement at various juvenile facilities.

59. The jurors were allowed to view these pictures for ten seconds during the Commonwealth's presentation of its penalty phase case-in-chief. N.T., 11/10/1994, pp. 2561–62.

11/10/1994, p. 2772. Ultimately, over an objection by Appellant's counsel, the trial court allowed the jurors to view these images, displayed on an easel in the courtroom, but for "no more than 30 seconds." N.T., 11/10/1994, pp. 2772, 2778.

Appellant contends that the trial court erred in allowing the jurors access to the victims' pictures during their deliberations because the probative value of these images was outweighed by their prejudice. Further, although Appellant concedes that photographs of Burghardt and Schmoyer were relevant to the issue of the aggravating circumstance of "torture," *see* 42 Pa.C.S. § 9711(d)(8), he also argues that Fortney's photos were irrelevant, since "torture" was not an aggravating circumstance presented in that case. *See* Brief for Appellant, p. 82.

Instantly, as admitted by Appellant, images of Burghardt and Schmoyer were clearly relevant to establish the aggravating circumstance of "torture." Furthermore, as explained by the trial court, images of Fortney were admissible to show the existence of another aggravator; namely, that the murder was committed "while in the perpetration of a felony," 42 Pa.C.S. § 9711(d)(6). *See* N.T., 11/10/1994, pp. 2779–80.[60] Having independently reviewed the photographs, we find no error on the part of the trial court in acquiescing to the jury's request. *See Commonwealth v. Brown*, 567 Pa. 272, 786 A.2d 961, 971 (2001) (finding that approximately life-size slides of the victim were "highly probative of [the] intent to inflict unnecessary pain or suffering and that [the killing was done] in a manner or means that are heinous, atrocious, or cruel, or show exceptional depravity"), *cert. denied*, 537 U.S. 1187, 123 S.Ct. 1351, 154 L.Ed.2d 1018 (2003); *also see Commonwealth v. Saranchak*, 544 Pa. 158, 675 A.2d 268, 275–76 (1996), *cert. denied*, 519 U.S. 1061, 117 S.Ct. 695, 136 L.Ed.2d 617 (1997). Moreover, contrary to Appellant's contention, his counsel strenuously objected to allowing the jury to view the pictures. N.T.,

---

**60.** The trial court found that the pictures were relevant to establish that Fortney was raped. N.T., 11/10/1994, pp. 2779–80. We note that Appellant completely ignores (and fails to mention in his brief) the trial court's explanation for its ruling.

11/9/1994, pp. 2546, 2556–58, 2561–62; N.T., 11/10/1994, pp. 2772–81. Therefore, Appellant's ineffectiveness claim has absolutely no factual basis.

### c. Testimony of Robert Burns

The defense began its penalty phase presentation on November 9, 1994. However, because the last three defense witnesses, including Robert Burns (Burns), a principal of St. Gabriel's Hall, where Appellant was placed as a juvenile on prior charges, and a secretary from that facility, were out of town and subpoenaed for the next day,[61] the proceedings ended early (at approximately 4:00 pm) and were continued to November 10, 1994. N.T., 11/10/1994, pp. 2630–31. On that day, starting at around 9:30 a.m., the defense resumed its case with the testimony of William Mocriski. N.T., 11/10/1994, pp. 2641–45. His testimony lasted approximately ten minutes and, at its conclusion, Appellant's counsel informed the trial court that the next witness—Burns—would not be arriving until 10:15 a.m. or 10:30 a.m. N.T., 11/10/1994, pp. 2636, 2649–2651. Later, Appellant's counsel acknowledged that this witness was originally subpoenaed for 9:00 a.m. N.T., 11/10/1994, pp. 2651–52. He also related that Burns and the secretary from St. Gabriel's Hall, who was apparently traveling with Burns, were the last witnesses to testify on behalf of Appellant. N.T., 11/10/1994, pp. 2650–52. The trial court called for a thirty-minute recess and the jury was taken out of the courtroom at 9:44 a.m. N.T., 11/10/1994, p. 2653.

At 10:23 a.m., Appellant's counsel informed the trial court that: (1) Barbara Brown, Appellant's mother, agreed to testify for the defense; and (2) Burns and the secretary from St. Gabriel's Hall would be called to the witness stand after her testimony. N.T., 11/10/1994, p. 2676. The testimony of Barbara Brown concluded at around 10:45 a.m. N.T., 11/10/1994, p. 2695. However, by that time, although one of Appellant's counsels went to find Mr. Burns and the secretary from St. Gabriel's Hall, they were still not present in the courtroom.

---

61. It appears that Burns was subpoenaed for 9:00 a.m., November 10, 1994. The secretary, who worked at the St. Gabriel's Hall, was coming voluntarily. N.T., 11/10/1994, p. 2698.

N.T., 11/10/1994, p. 2695. At that point, the trial court requested that defense counsel make an offer of proof as to the substance of the expected testimony, which he did, identifying the witnesses and stating that their testimony would reflect on Appellant's academic and personal development at St. Gabriel's Hall. N.T., 11/10/1994, pp. 2696–98. The prosecutor refused to stipulate to this testimony, pointing out that there was conflicting evidence as to the extent of Appellant's progress at that facility. N.T., 11/10/1994, p. 2698.

By 10:50 a.m., counsel for Appellant, who went to retrieve the two witnesses, returned to the courtroom and stated that they still did not arrive. N.T., 11/10/1994, p. 2700. The court then waited until 11:00 a.m., giving the defense another opportunity to locate and present the two remaining witnesses. N.T., 11/10/1994, pp. 2704–05. At that time, because the witnesses still could not be located, over several objections by Appellant's counsel, the trial court ordered the parties to proceed with oral argument, explained to the jury the cause of the delay, and gave them a brief synopsis of the expected testimony that the defense sought to present and the prosecutor's rebuttal to that testimony. N.T., 11/10/1994, pp. 2699, 2703–06. Following the jury charge, the trial court admonished Burns, who, according to Appellant's counsel, arrived at 11:00 a.m., found Burns in contempt, and ordered him to pay a fine in the amount of $500.00. N.T., 11/10/1994, pp. 2770–71.

 Presently, Appellant argues that his sentence must be vacated because the trial court "unjustifiably" refused to grant a continuance to allow Burns to testify.[62] He also argues that his counsel was ineffective for failing to obtain such continuance.

 "The grant or refusal of a request for a continuance is a matter vested in the sound discretion of the trial court, and its decision, to grant or deny the request, will not be reversed by an appellate court in the absence of an abuse of that

62. Appellant does not make a similar argument with respect to the secretary from St. Gabriel's Hall, who arrived with Mr. Burns. N.T., 8/26/1999, p. 18.

authority." *Commonwealth v. Birdsong,* 538 Pa. 587, 650 A.2d 26, 34 (1994). The factors to be considered to determine whether the trial court's discretion was properly exercised are: (1) the necessity of the witness to strengthen the defendant's case; (2) the essentiality of the witness to defendant's defense; (3) the diligence exercised to procure his presence at trial; (4) the facts to which he would testify; and (5) the likelihood that he could be produced at the next term of court. *See id.* at 34; *Commonwealth v. Clayton,* 516 Pa. 263, 532 A.2d 385, 395 (1987), *cert. denied,* 485 U.S. 929, 108 S.Ct. 1098, 99 L.Ed.2d 261 (1988); *Commonwealth v. (Eddie) Smith,* 442 Pa.265, 275 A.2d 98, 101 (1971).

Appellant acknowledges that Burns "was scheduled to appear as the **first** witness of the day, but was delayed in his arrival." Brief for Appellant, p. 92 (emphasis supplied). Although there is conflicting evidence as to the true extent of the witness' absence,[63] one thing is clear—Burns was inexcusably late for a trial where a man's life stood in jeopardy. Applying the criteria set forth above to the facts at hand, we cannot find that the trial court's actions constituted an abuse of judicial discretion.

Initially, we note that Burns was not an essential witness in that he could only testify about his familiarity with Appellant during a nine-month stay at a juvenile facility. Again, however, the jury ultimately found the presence of the "catch all" mitigator. Therefore, Burns' testimony would have been redundant. Moreover, it is highly doubtful that the testimony of Burns would have strengthened Appellant's case. In fact, it is more than likely that it would have engendered the opposite effect. As demonstrated during the post-sentencing proceedings, although Burns could testify about his experiences with Appellant while he was placed at St. Gabriel's Hall, Burns was

---

**63.** It appears that although he was subpoenaed to appear at 9:00 a.m., on November 10, 1994, during a telephone conversation on November 9, 1994, Burns informed Appellant's trial counsel that he would not arrive until 10:10 a.m. to 10:30 a.m. N.T., 11/10/1994, pp. 2649, 2770. However, Burns did not actually arrive until some time at or after 11:00 a.m. Therefore, it is equally arguable that he was late by as much as two hours and as little as thirty minutes.

not aware of the particulars of Appellant's stay and was thus easily undermined as a witness.[64] More importantly, the testimony of Burns would have allowed the Commonwealth to introduce damning evidence concerning Appellant's juvenile placement at St. Gabriel's Hall. As the trial court observed:

> [T]he records at St. Gabriel's Hall reflect that [Appellant]'s initial adjustment was poor and "there has not been a great deal of improvement since then, according to staff . . . he is usually manipulative and slow to cooperate. His peer relationships are typically unsatisfactory." In addition, [Appellant] absconded from the institution, stole a staff member's wallet with $200.00 in it, and violated a variety of rules and regulations.

Trial Court Opinion, pp. 56–57. We observe that the trial court went out of its way in repeatedly giving time to the defense to find its last two witnesses and, ultimately, when the witnesses could not be located, gave the jury the synopsis of their testimony. Ultimately, given the circumstances at hand, such as the length of the trial, the fact that Burns was the last witness to testify, and his unexcused lateness, we find that the trial court's action did not constitute an abuse of judicial discretion. We similarly reject Appellant's claim that his counsel was ineffective in failing to seek a continuance, in light of the transcript that indicates that counsel did everything they could to secure the testimony of Burns.

### d. Failure to Testify

■ Appellant argues that his trial counsel were ineffective for failing to call him as a witness during the penalty phase proceedings. As the Commonwealth correctly points out, however, this argument blatantly ignores Appellant's unequivocal refusal to testify, which he articulated to his attor-

64. For example, Burns acknowledged that Appellant escaped from St. Gabriel's Hall during his stay at that facility and stole clothing from others. N.T., 8/26/1999, pp. 21–22. Although he was the principal at St. Gabriel's Hall, Burns was not aware of the reasons for Appellant's placement there, his prior criminal background, did not know whether Appellant "actually improved" by the time of his release, and never read any of the counselors' reports. *Id.* at 22–24.

neys at trial and now attempts to justify as a misunderstanding of his constitutional rights (which Appellant also blames on his counsel).

During the post-sentencing hearing, on direct examination by Appellant's present attorney, one of Appellant's trial counsels, Carmen Marinelli, testified as follows:

**Defense Counsel:** In the mitigation phase of the trial, sir, did either you or Mr. Burke have any discussions with [Appellant] as to whether he should testify in that portion of the case?

**Attorney Marinelli:** We had many conversations with [Appellant]. In the mitigation phase and also in the guilt and innocence phase, [Appellant] absolutely, positively refused to testify. On many occasions, [Appellant] did not even wish to talk to us.

\* \* \*

**Defense Counsel:** Okay. Did you give [Appellant] any advice with regard to whether he should or should not testify?

**Attorney Marinelli:** During both phases it was our, I don't want to say request, we almost pleaded with the man to testify. All he could do to help him. He refused to testify.

N.T., 11/13/1998, pp. 60–61. Later, he was called to testify by the Commonwealth and reaffirmed his previous statements:

**Prosecutor:** [W]ould you please let us know what efforts you made to get [Appellant] to testify on his own behalf?

**Attorney Marinelli:** Begged, pleaded. On many occasions, we were—Mr. Burke and myself alone told him the only way he has any chance of winning the guilt and innocence, or not having the death penalty, is for him to testify. The people want to hear from the defendant.

**Prosecutor:** Okay. Did you explain to him that people want to hear him deny this?

**Attorney Marinelli:** Yes, absolutely.

**Prosecutor:** Did you ever tell him, either for the guilt or innocence, or for the penalty phase, that if he testified, his prior record would definitely come out?

**Attorney Marinelli:** No, whether it would definitely come out in or not, nobody is going to know, because we would have objected to any reference to the prior record. It would have been for the Judge to make his decision. You know, his prior record didn't have much to do—As far as I was concerned, the prior record didn't have much to do with the three homicides he was being tried for. What we wanted to do is we wanted to have him get up here; get on the witness stand; look the jury in the eye and tell them, no, I did not do this, they have the wrong person. Mr. Robinson, on many occasions, refused to do this.

N.T., 9/10/1999, pp. 10–11; *see also* N.T., 9/10/1999, p. 25. The other trial counsel, James Burke, who was primarily responsible for preparing the defense during the penalty phase, testified in a similar fashion:

**Prosecutor:** Okay. Let's start with [Appellant]. Did you discuss with him the importance of him taking the stand in the penalty phase of the case?

**Attorney Burke:** I begged him.

**Prosecutor:** And what was his response to you?

**Attorney Burke:** He was obsessed with his appeal, and I did not voice upon him that he had to testify after he was convicted and we were preparing to go right into the penalty phase. I talked to him long before that about what he was going to have to do in the event that he was found guilty in this case, in his cases. He didn't care.

\* \* \*

**Prosecutor:** Did you attempt to explain to him the importance of his testimony?

**Attorney Burke:** We did.

**Prosecutor:** Did you let him know that the-his testimony would be exclusive to pleading for his life and that was it?

**Attorney Burke:** In the penalty phase, absolutely.

**Prosecutor:** Okay. [Appellant] testified today that he didn't know that his testimony could be limited. Is that correct?

**Attorney Burke:** In the penalty phase?

**Prosecutor:** Um-hum.

**Attorney Burke:** No, that's not correct. As a matter of fact, he had denied that he had done these things. It's not uncommon for the person who denies the underlying crimes they are convicted of, to sit before the jury and tell them they made a horrible mistake that, "I didn't do this. I want your sympathy. I want your mercy." ... He could have continued to deny the offenses.

**Prosecutor:** And was that your strategy?

**Attorney Burke:** Of course. He didn't have to ...

**Prosecutor:** Did you explain to [Appellant] that he could continue to say to the jury, "Look, you've made a terrible mistake, but please spare my life"?

**Attorney Burke:** Right, and he wouldn't have to answer questions ... regarding the offenses if he could just say, "I did not do that."

N.T., 11/24/1998, pp. 193–95; *see also* N.T., 11/13/1998, p. 26; N.T., 11/24/1998, pp. 200, 203–04.

We see no reason to put our faith in Appellant's self-serving proclamations that he did not fully understand his rights and disbelieve the testimony of his two trial counsel. Given the testimony cited above, we reject this claim of counsel ineffectiveness.

### e. Torture

 Appellant raises multiple issues in relation to the jury's determination that the killings of Burghardt and Schmoyer implicated the aggravating circumstance of "torture," 42 Pa.C.S. § 9711(d)(8).[65] We will not address these

---

**65.** Appellant contends that: (1) there was insufficient evidence for the jury to find the existence of this aggravator in relation to both homicides; (2) the evidence presented was "irrelevant, unreliable, and lacked proper foundation;" and (3) the jury charge in relation to this aggravator was "inadequate and incomplete." Brief for Appellant, pp. 114–129.

arguments, because we consider them moot, in light of the fact the capital sentences in those cases were vacated by the trial court on an unrelated basis.[66]

### f. References to Aggravating Circumstance 42 Pa.C.S. § 9711(d)(11)

Appellant alleges that throughout the penalty phase proceedings, the trial court, the prosecutor, and both defense attorneys incorrectly referred to the aggravator expressed in 42 Pa.C.S. § 9711(d)(11), as the "multiple victim" or "multiple killings" aggravating circumstance. Appellant maintains that these misnomers confused the jury and "actually **lessened** the burden of the Commonwealth." Brief for Appellant, p. 130 (emphasis in original). He argues that "[t]his very egregious statutory 'misconstruction' requires that all three sentences of death be vacated." *Id.*

We again note that two of the three capital sentences imposed by the trial court have been vacated. Therefore, we consider issues asserted in relation to these sentences to be moot and, in connection with arguments at hand, will consider only claims relating to the remaining death sentence in the Fortney case.

The Sentencing Code, 42 Pa.C.S. §§ 9701, *et seq.*, sets forth the aggravating circumstances that the jury may consider in imposing capital punishment. One of these aggravators is articulated as follows:

> The defendant has been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue.

42 Pa.C.S. § 9711(d)(11). Appellant is correct in pointing out that, during the trial, "multiple victims" or "multiple killings"

---

**66.** Appellant also maintains that the alleged errors he articulated in relation to the "torture" aggravator in the Burghardt and Schmoyer homicides "necessarily infected the jury's deliberations in [the] Fortney" homicide. Brief for Appellant, p. 129 n. 26. Without even considering the merits of these purported errors, we note that "torture" was not an aggravator presented in the Fortney homicide. Therefore, we are not persuaded by Appellant's wholly unsubstantiated claim, especially given the trial court's clear instruction as to what cases in which the jury was to consider this aggravator.

was used by all participants as a shorthand for this aggravator. However, we find that this was not erroneous and Appellant was not prejudiced in this regard.

The offenses introduced by the Commonwealth to establish the presence of this aggravator in relation to the Fortney homicide were the murders of Burghardt and Schmoyer. All three homicides were tried jointly and Burghardt, Schmoyer, and Fortney, were routinely referred to as "victims" during the trial, because, quite simply, they were the victims. Hence, the jury was not led astray by references to unrelated crimes committed by Appellant. Rather, they were asked to refer to evidence concerning the victims of the crimes they were adjudicating. Accordingly, within the confines of this trial, given that the crimes presented to prove this aggravating circumstance were being tried simultaneously, we see no error when the parties referenced 42 Pa.C.S. § 9711(d)(11) as the "multiple victims" aggravator.

Similarly, we see no error when the term "multiple killings" was used in relation to 42 Pa.C.S. § 9711(d)(11). During the guilt phase of the proceedings, the jury found that Appellant killed three women. The Commonwealth asked the jurors to consider these determinations—namely, that Appellant was responsible for murdering Burghardt and Schmoyer—in finding the existence of the aggravator set forth in 42 Pa.C.S. § 9711(d)(11) as it related to the Fortney homicide. There was no error.

Moreover, in rejecting Appellant's contention that the Commonwealth's burden of proof was somehow lessened by these references, we simply point out that the trial court, on multiple occasions, instructed the jury as to the burden of proof carried by the Commonwealth. *See, e.g.,* N.T., 11/10/1994, pp. 2739, 2744, 2746. These instructions could not have been any clearer and we are bound to presume that the jurors followed them.[67] *See Commonwealth v. Baker,* 531 Pa.

---

**67.** Given that we reject Appellant's substantive assertions of error, his multiple counsel ineffectiveness claims related to these arguments also fail.

541, 614 A.2d 663, 672 (1992) ("The presumption in our law is that the jury has followed instructions [of the trial court]"); *Freeman*, 827 A.2d at 409.

### g. Jury Charge in Relation to 42 Pa.C.S. § 9711(d)(11)

▮▮▮ Appellant also argues that the trial court improperly instructed the jury in relation to the aggravator embodied in 42 Pa.C.S. § 9711(d)(11). Initially, the trial court gave the following instruction:

> I have gone over the evidence with counsel and these are the aggravating and mitigating circumstances which I charge you are applicable in this case.
>
> The list is long under the law but these are the ones that I have found are relevant and material in your particular case. Sometimes there are few, sometimes there are more.
>
> But you will see here, the following aggravating circumstances are submitted to the jury and must be proven by the Commonwealth beyond a reasonable doubt. . . .
>
> Multiple killings. The actual language in the statute is complicated. But we've agreed that multiple killings is more simple, just to say that, than the actual language. That is an aggravating factor. If one killing occurred with others, that's to be considered an aggravating factor. And since you've found three murders happened by this defendant, I would think that that would also have been prove beyond a reasonable doubt.

N.T., 11/10/1994, pp. 2745–46. Later, after a sidebar conference with counsel, the court stated the following:

> Counsel have asked me to read—what we have in the verdict slip is a shorthand version. I think I had told you this isn't the actual language of the Act.
>
> To be safe, they want me to read the actual language of the aggravating circumstances.
>
> * * *
>
> In multiple—I just put down multiple killings. In that one, the defendant has been convicted of another murder com-

mitted either before or at the time of the offense at issue. Those are precise words of the law.

* * *

Now, I also indicated that you should find, because of the evidence you heard, numbers one and two [referring to aggravators 42 Pa.C.S. § 9711(d)(6) and 42 Pa.C.S. § 9711(d)(11)]. I really can't direct you to do that. That's your finding to make.

You're on your own as to whether or not multiple killings are a factor and while perpetrating a felony are a factor. Take into account consideration what you've already found but I can't direct you to find that.

N.T., 11/10/1994, pp. 2760–62.[68]

 Presently, Appellant's convictions in relation to the Burghardt and Schmoyer homicides were properly considered by the jury for purposes of establishing 42 Pa.C.S. § 9711(d)(11) in relation to the Fortney homicide, because these murders preceded the Fortney murder. While the initial instruction given by the court improperly directed the jurors to find the presence of this aggravator, the subsequent, curative statement provided the correct account of the law and retracted the previous instruction as erroneous. As explained previously, we are bound to presume that the jurors followed the curative instruction. *See Baker, supra; Freeman, supra.* Hence, Appellant is not entitled to relief on this claim.

### h. Response to a Jury Question

 At one point during the charge, the following exchange took place between the trial court and one of the jurors:

**Juror:** On the life in prison, is that without parole, just so that we are sure? Would there be a chance of parole if it was life in prison?

68. Again, we feel compelled to note that, in his brief to this Court, Appellant does not mention or cite the last part of the curative instruction given by the trial court that related the jury's task of finding the presence of aggravating circumstances.

**Trial Court:** I don't see how I can guarantee—that's the present law. But what if the legislature changes the law? I can't guarantee that. That's the way the law is now.
**Juror:** Just so we know, Your Honor.
**Trial Court:** Who knows two years from now if they'll change the law. I can't tell you.

N.T., 11/10/1994, pp. 2767–68. At that point, the prosecutor requested a sidebar conference. At the conclusion of the discussion, the trial court gave the jury the following answer: "I am to tell you, and it's accurate, 'Life is life.' There won't be any parole. Life is life." N.T., 11/10/1994, p. 2769.

 Presently, Appellant argues that the trial court failed to mention that there was no possibility of parole if Appellant would receive a life sentence. Thus, Appellant maintains that the jury was confused by the instructions and the trial court further compounded their misunderstanding by giving an answer indicative that "life imprisonment" may include the possibility of parole.[69] Ultimately, Appellant contends that "not informing the jury during the sentencing instructions that a life sentence means life without the possibility of parole offends the evolving standards of decency that underlie" the U.S. and Pennsylvania Constitutions. Brief for Appellant, p. 143.

Essentially, Appellant's contention is that the trial court should have provided the jury with the instruction pursuant to *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), that a "life sentence" means "life without a possibility of parole." However, as this Court has repeatedly held, "a *Simmons* instruction is required only where the

**69.** Appellant also alleges that the question asked by the juror indicated that the jury was deliberating prematurely and, therefore, yet another purported impropriety was at hand. *See* Brief for Appellant, p. 138 n. 31. In support of this contention, Appellant cites *Commonwealth v. Kerpan*, 508 Pa. 418, 498 A.2d 829 (1985). But *Kerpan*, where the trial court "essentially encouraged the jurors to hold discussions among themselves" by way of a direct instruction, is entirely distinguishable from the matter at hand, since no such instruction was presently given. *Id.* at 831. Moreover, aside from Appellant's wholly frivolous claim, there is absolutely nothing to indicate that premature discussions among the jurors actually took place.

prosecution makes the future dangerousness of the defendant an issue in the case and the defendant specifically requests such an instruction." *Commonwealth v. Champney*, 574 Pa. 435, 832 A.2d 403, 417 (2003); *see also Commonwealth v. Robinson*, 554 Pa. 293, 721 A.2d 344, 355 (1998), *cert. denied*, 528 U.S. 1082, 120 S.Ct. 804, 145 L.Ed.2d 677 (2000).[70] Here, the Commonwealth did not argue future dangerousness and defense counsel did not request a *Simmons* instruction. Therefore, no instruction was required.

■ As it relates to the statement made by the trial court in response to the question posed by the juror, it is similar to what this Court faced in *Commonwealth v. Clark*, 551 Pa. 258, 710 A.2d 31 (1998), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1465, 143 L.Ed.2d 550 (1999). Just as in this case, the trial court in *Clark* responded to the jury's question as to the meaning of "life imprisonment" by acknowledging, *inter alia*, that, although the present state of the law does not allow parole in the circumstances at hand, it cannot predict whether the legislature will decide to change that in the future. *Id.* at 35. We found that this instruction was not erroneous, *id.* at 36, and believe that *Clark* is directly on point with the circumstances presently before us. Therefore, we find no error in the instruction given by the trial court.[71]

### i. Constitutionality of the Death Penalty Statute

■ Appellant contends that his counsel was ineffective for failing to move to bar the Commonwealth from seeking the death penalty in this case pursuant to various provisions of the U.S. and Pennsylvania Constitutions. Initially, Appellant

70. We note that some Justices on this Court have consistently expressed the view that they would require a *Simmons* instruction in all cases. *See, e.g., Robinson, supra* (Flaherty, C.J., dissenting; Zappala, J., concurring; Nigro, J., concurring).

71. Appellant attempts to distinguish *Clark*, because in the present case, "the trial court's comments were in response to a jury question and not a result of counsels' arguments [as in Clark]." Brief for Appellant, p. 141. This differentiation is devoid of merit. *See Clark*, 710 A.2d at 35 (stating that "[t]he jury **inquired** as to the meaning of 'life imprisonment.' The trial court **responded to this question** as follows ...") (emphasis supplied).

maintains that his trial counsel should have challenged the constitutionality of the death penalty statute because "there is an 'unacceptable risk' that the decision to prosecute Appellant and to seek the death penalty against him was based upon selective factors, in violation of [Appellant]'s protections against cruel and unusual punishment guaranteed by the Eight Amendment to the United States Constitution." Brief for Appellant, p. 158. Appellant identifies these "selective factors" as his indigence and his race; yet, he also concedes that "[t]here is no evidence ... to suggest that the District Attorney actually employed these improper factors in the decision to seek the death penalty." Brief for Appellant, pp. 158–9. Moreover, Appellant presents a number of arguments that the Pennsylvania Death Penalty statute is unconstitutional on its face.

The claims raised by Appellant in regard to the constitutionality of 42 Pa.C.S. §§ 9701, et seq., have been previously addressed by this Court. We simply refer Appellant to the multitude of decisions issued by this Court since we first found the present statute to be constitutional in Zettlemoyer, supra, rejecting arguments essentially identical to what Appellant raises now. For this reason, we find that Appellant's claim of counsel ineffectiveness fails, because the substantive arguments that his counsel could have presented lacked merit.

## 4. Prosecutorial Misconduct

Appellant maintains that the prosecutor made a number of improper comments during the opening statement, the guilt phase summation, and the penalty phase summation. Additionally, Appellant asserts a number of counsel ineffectiveness claims for failing to object to these purportedly improper comments.

"Our Court has held that as long as there is a reasonable basis in the record for the comments, we will permit vigorous prosecutorial advocacy." Commonwealth v. Miles, 545 Pa. 500, 681 A.2d 1295, 1302 (1996), cert. denied, 520 U.S. 1187, 117 S.Ct. 1472, 137 L.Ed.2d 684 (1997). See, e.g., id. at 1301–03 (finding that it was proper for the prosecutor to analogize

defendants' actions to the hunting behavior of animals and prey, where the account of the crime supported this description); *Commonwealth v. (William) Johnson*, 542 Pa.384, 668 A.2d 97, 106–07 (1995) (finding no basis for mistrial because of the prosecutor's description of defendants as "henchmen" where this reference was "based on the reasonable inferences drawn from the evidence"), *cert. denied*, 519 U.S. 827, 117 S.Ct. 90, 136 L.Ed.2d 46 (1996); *Commonwealth v. Jones*, 530 Pa. 591, 610 A.2d 931, 943 (1992) (upholding the prosecutor's description of defendants as a "murdering, child-killing, back-shooting" trio, "slaughterers," and "executioners," where these statements were reasonably based upon the evidence produced at trial), *habeas corpus granted in part*, 1996 WL 296525 (E.D.Pa.1996); *Commonwealth v. D'Amato*, 514 Pa. 471, 526 A.2d 300, 313 (1987) (finding that the prosecutor's characterization of defendant as a "clever, calculating and cunning executioner" did not unavoidably prejudice defendant so that the jury could not weigh the evidence properly and render a true verdict).

"Challenged prosecutor comments must be considered in the context in which they were made." *King*, 721 A.2d at 783. In reviewing the statements made by the prosecutor, we have noted that:

[A] prosecutor must be free to present his or her arguments with logical force and vigor. Reversible error only exists if the prosecutor has deliberately attempted to destroy the objectivity of the fact finder such that the unavoidable effect of the inappropriate comments would be to create such bias and hostility toward the defendant that the jury could not enter a true verdict.

*Miles*, 681 A.2d at 1300; *also see Paddy*, 800 A.2d at 316. "Furthermore, during the penalty phase, where the presumption of innocence is no longer applicable, the prosecutor is permitted even greater latitude in presenting argument." *King*, 721 A.2d at 783.

Moreover, even if the alleged statements by the prosecutor may have been improper, we have held that "not every intemperate or uncalled for remark by a prosecutor requires a

new trial." *Miles*, 681 A.2d at 1302. Indeed, "where the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the error is so insignificant by comparison that it is clear beyond a reasonable doubt that the error could not have contributed to the verdict, then the error is harmless beyond a reasonable doubt." *Id.* (citing *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155, 166 (1978)). With this standard in mind, we now examine the specific arguments raised by Appellant.

### a. Guilt Phase

### i. Opening Statement

Appellant complains that during his opening statement to the jury, the prosecutor referred to Appellant as a "predator," N.T., 10/24/1994, p. 57, and asked the jury not "to lose sight of the ferocity of what was involved here, of the violence, of the intent to kill," N.T., 10/24/1994, p. 59.

The Webster's Third New International Dictionary defines "predator" as, *inter alia*, "one that prays, destroys, or devours" and "predatory" as, *inter alia*, "relating to, or practicing plunder, pillage, or rapine[;] using violence or robbery for aggrandizement[;] destructive, harmful, injurious." Webster's Third New International Dictionary of the English Language Unabridged, p. 1785. These definitions are entirely consistent with the way the Commonwealth portrayed Appellant to the jury—a calculating attacker, who prowled the East Allentown area, and killed his victims with vicious ferocity.

Moreover, the intent of the perpetrator, which the prosecutor's statement emphasized, is an essential element that the Commonwealth must prove to establish first-degree murder. *See* 18 Pa.C.S. § 2502(a) (defining "murder of the first degree" as "[a] criminal homicide ... committed by an **intentional** killing") (emphasis supplied); *also see* 18 Pa.C.S. § 2501(a) (stating that "[a] person is guilty of criminal homicide if he **intentionally,** knowingly, recklessly or negligently causes the death of another human being") (emphasis supplied). Thus, it was entirely appropriate for the prosecutor to focus the jury's attention on this aspect of the case.

As reflected above, we believe that these statements were within the context of the evidence presented by the Commonwealth. Therefore, this Court finds no misconduct on the part of the prosecutor and rejects Appellant's claim that his counsel was ineffective for failing to object to these comments.

### ii. Closing Statement

 Appellant argues that the prosecutor's guilt phase summation was inflammatory because he: (1) referred to Appellant as a "territorial predator," N.T., 11/8/1994, p. 2246; (2) stated that "only four people have seen [Appellant's] behavior and action and only one of them is alive to tell you about her experiences with him," N.T., 11/8/1994, p. 2247; and (3) told the jury that "[i]t's time to put the nightmare on the east side to bed. It's time to do that by returning verdicts of guilty, guilty, guilty." N.T., 11/8/1994, p. 2272. Additionally, Appellant contends that the prosecutor improperly commented upon his failure to produce evidence, when, he stated as follows:

Do you think ... if they had somebody who could refute the Commonwealth's witnesses, we would not have seen that witness from the witness stand?

N.T., 11/8/1994, p. 2248; *see also* N.T., 11/8/1994, p. 2265. Appellant asserts that, by way of this comment, the prosecutor suggested that the defense had some burden of proof in the case.

Again, the characterization of Appellant as a "territorial predator" is entirely consistent with the case presented by the prosecutor, who maintained that Appellant targeted a certain type of victims within a specific geographical area. Similarly, the comment that only one of Appellant's victims was still alive was appropriate, in light of the Commonwealth (1) providing testimony that Appellant attacked Burghardt, Schmoyer, Fortney, and Sam–Cali; (2) offering proof that Appellant was responsible for the killings of Burghardt, Schmoyer, and Fortney; and (3) presenting the testimony of Sam–Cali as the only victim who survived her encounter with Appellant.[72] Further-

72. In relation to this argument, Appellant likens the present case to our decisions in (1) *Commonwealth v. Harvell*, 458 Pa. 406, 327 A.2d 27

more, the prosecutor's reference to "the nightmare on the east side," falls squarely within the gamut of permissible oratorical flare.

Finally, a reading of the entire guilt phase summation by the prosecutor does not disclose any unfair suggestion that Appellant bore some burden of proof in the case. Indeed, the statement cited by Appellant refers to the fact that the DNA evidence presented by the Commonwealth via testimony of several expert witnesses was uncontradicted by any defense witnesses, which is fully consistent with the case presented to the jurors.[73] Furthermore, the trial court instructed the jury concerning not making an adverse inference because Appellant did not testify and that, as a matter of law, the defendant is not required to produce any evidence to establish his innocence. *See* N.T., 11/8/1994, pp. 2280–82, 2314. Accordingly, we reject the prosecutorial misconduct arguments and the corresponding counsel ineffectiveness claims asserted by Ap-

(1974), and *Commonwealth v. Lipscomb*, 455 Pa. 525, 317 A.2d 205 (1974), where the prosecutors during their summations speculated what the deceased victims would have said to the jurors; and (2) *Commonwealth v. Gilman*, 470 Pa. 179, 368 A.2d 253 (1977), where the prosecutor appealed to the prejudice of the jury by invoking the memory of the victim in an inappropriate manner. It is plainly evident, however, that the present circumstances are factually distinguishable from these cases.

**73.** The comment referenced by Appellant appears in the following sequence:

Again, I would suggest to you that we've met that particular burden which is placed upon us. We welcome that burden and we've proven it through witnesses who we've heard. We've proven it through witnesses, expert witnesses, from the FBI, Dr. Hal Deadman from the FBI, and expert in DNA. And when you hear the DNA testimony and you consider the DNA testimony, what I want you to do is consider, ladies and gentlemen, who is the expert? Dr. Hal Deadman? Dr. Robert Ferrell? Or Carmen Marinelli? Do you think, ladies and gentlemen, if they had somebody who could refute the Commonwealth's witnesses, we would not have seen that witness from the witness stand? Dr. Hal Deadman? Dr. Robert Ferrell? Who are you going to believe? Them or Carmen Marinelli? That's what it comes down to, because you decide from the witness stand, are they experts in their field? Is Dr. Deadman somebody who you can believe, somebody who you can rely upon?

N.T. 11/8/1994, p. 2248.

pellant concerning the prosecutor's guilt phase closing statement.

In relation to all of the allegations of prosecutorial misconduct asserted herein, we also note that the prosecutor's statements are not evidence. *See Commonwealth v. Gibson*, 547 Pa. 71, 688 A.2d 1152, 1164(Pa.), *cert. denied*, 522 U.S. 948, 118 S.Ct. 364, 139 L.Ed.2d 284 (1997); *(William) Johnson*, 668 A.2d at 106. Presently, the trial court instructed the jurors, on the first day of the trial and again at the beginning of the jury charge, that: (1) although the statements of the attorneys are important, they do not amount to facts or evidence; and (2) the jury is the only body qualified to find the existence of pertinent facts. *See* N.T., 10/24/1994, pp. 36–37; N.T., 11/8/1994, pp. 2274, 2276–77, 2333. We find that this instruction served as a further cure for any improper prejudice that may have resulted from the prosecutor's comments. *See Commonwealth v. Carter*, 537 Pa. 233, 643 A.2d 61, 77 (1994) (holding that the trial court's instruction to the jury not to consider prosecutor's statements as evidence cured any prejudice which may have been caused by the comments made by the prosecutor), *cert. denied*, 514 U.S. 1005, 115 S.Ct. 1317, 131 L.Ed.2d 198 (1995).

### b. Penalty Phase

### i. Closing Statement

Finally, in relation to the penalty phase summation, Appellant argues that his counsel was ineffective because he failed to object to the following statement:

> And as he sits there, ladies and gentlemen, we have not heard any remorse. We have not heard any calling for the victims. He sits there, to some degree, like a sphinx and you have to decide whether to impose life or death in the particular case.

> * * *

> Think about whether or not there is any remorse.

N.T., 11/10/1994, pp. 2706–2707. According to Appellant, this constituted an impermissible comment on Appellant's Fifth Amendment right against self-incrimination.

 Appellant did not testify during either the guilt phase or the penalty phase of the trial. Hence, the statement cited above appears to be an improper reference to Appellant's valid exercise of his federal constitutional right and should have been objected to by trial counsel. We are convinced, however, that Appellant suffered no prejudice as a result of the prosecutor's comment.

First, we note that at issue is a brief statement that did not contain a direct reference to the fact that Appellant did not testify during the trial. Second, the trial court specifically instructed the jury that "[i]t is entirely up to the defendant whether to testify and you must not draw any adverse inference from his silence." N.T., 11/10/1994, p. 2740. We feel that this instruction more than adequately cured any ill effect of this fleeting comment that (as we stated before) did not even contain a direct reference to Appellant's exercise of his Fifth Amendment right. *See Baker, supra* (the jury is presumed to follow the instructions); *Freeman, supra.* For all of the above reasons, Appellant is not entitled to relief on this ground.[74]

## C. Statutory Review of the Death Sentence

 Having concluded that Appellant is not entitled to relief on any of the claims that he raises, we must affirm Appellant's sentence of death unless we determine that it was the product of passion, prejudice, or any other arbitrary factor or unless we determine that the evidence fails to support the finding of at least one aggravating circumstance. *See* 42 Pa.C.S. § 9711(h)(3).

---

**74.** Appellant also contends that the cumulative effect of all allegedly improper prosecutorial comments during the guilt and penalty phases of the trial undermined the integrity of his convictions and sentences. We do not address this argument in light of our conclusion that, when considered on individual basis, none of the allegations of prosecutorial misconduct entitles Appellant to any relief. *See Freeman,* 827 A.2d at 416 (observing that "[i]t is settled ... that no number of failed claims may collectively attain merit if they could not do so individually").

■■■■■ Upon review of the record, we find that Appellant's death sentence was not the product of passion, prejudice, or any other arbitrary factor. Furthermore, we conclude that the evidence was sufficient to support the finding of three aggravating circumstances in relation to killing of Fortney; namely: (1) the killing was committed during the perpetration of a felony;[75] (2) Appellant had a significant history of felony convictions involving the use or threat of violence;[76] and (3) Appellant "has been convicted of another murder committed in any jurisdiction and committed either before or at the time of the offense at issue."[77]

Accordingly, we affirm the verdict and the sentence regarding No. 58 of 1994 Lehigh County Court of Common Pleas, Criminal Division.[78] We also affirm the Order of the trial court regarding Nos. 55 and 56 of 1994, Lehigh County Court of Common Pleas, Criminal Division.

Former Justice LAMB did not participate in the decision of this case.

Justice NIGRO files a concurring opinion.

Justice SAYLOR files a concurring opinion.

Justice NIGRO concurring.

I join in the result reached by the majority, as I agree with its ultimate conclusion that Appellant is not entitled to relief. I write separately, however, to address its analysis as it relates to two of Appellant's claims.

In one of his many claims of error regarding the *voir dire* process, Appellant argues that the trial court abused its discretion in refusing to dismiss several venirepersons for cause, thereby forcing him to use his peremptory challenges to

75. 42 Pa.C.S. § 9711(d)(6).

76. 42 Pa.C.S. § 9711(d)(9).

77. 42 Pa.C.S. § 9711(d)(11).

78. Pursuant to 42 Pa.C.S. § 9711(i), the Prothonotary of this Court is hereby directed to transmit the complete record of this case to the Governor of the Commonwealth of Pennsylvania.

strike those venirepersons. In analyzing and ultimately rejecting this claim, the majority cites to this Court's decision in *Commonwealth v. Colson*, 507 Pa. 440, 490 A.2d 811, 818 (1985), where the Court held that the trial court did not err in refusing to dismiss a venireperson for cause even though that venireperson, among other things, knew the victim's mother, knew the prosecution witness who discovered the victim's body, knew the wife of the prosecuting officer, and believed that the victim had actually once employed her husband. While I recognize this Court's duty to adhere to the principle of *stare decisis*, I am compelled to note that I simply do not agree with the *Colson* court's conclusion. Rather, it is abundantly clear, at least to me, that the nature of the venireperson's many ties to those involved in that case created a sufficient likelihood of bias so as to warrant the venireperson's disqualification. *Id.* at 818 ("A challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses, that the court will presume a likelihood of prejudice or demonstrates a likelihood of prejudice by his or her conduct and answers to question[s]."). Nevertheless, I do not believe that the relevant facts in the instant case are even remotely similar to those in *Colson*, as none of the venirepersons at issue here had the same type of relationship to the case as the venireperson in *Colson* had. Indeed, in my view, the situations of the venirepersons in the instant case are much more akin to the situation of the venireperson in *Commonwealth v. Patterson*, 488 Pa. 227, 412 A.2d 481 (1980), who recognized one of the investigating officers from church services, but could not identify the officer by name. Thus, just as this Court held in *Patterson* that the trial court did not err in refusing to dismiss the juror at issue in that case, I agree with the majority that the trial court below did not err in refusing to dismiss the challenged venirepersons for cause here.

Appellant also argues that the trial court erred when it refused to question jurors about their knowledge of a newspaper article relating to a prospective witness, Latanio Fraticeli. That article, as more fully explained by the majority, was

published mid-trial and discussed incriminatory statements Fraticeli made about Appellant during an *in-camera* hearing. Despite the fact that the jury had not been sequestered, the trial court did not question the jurors-either individually or collectively-about the article and instead opted to reiterate its general instructions to the jury that it was to avoid any media coverage of the case and determine the facts of the case based only upon the evidence at trial. *See* N.T., 11/3/1994, at 1828. I question the decision by the court not to ask the jurors about the article, especially in light of this Court's clear pronouncement in *Commonwealth v. Bruno* that "the preferred procedure when highly prejudicial material is publicized during the trial and the jury is not sequestered is to question the jurors individually, out of the presence of the other jurors." 466 Pa. 245, 352 A.2d 40, 52 (1976). In finding that the trial court did not err in failing to do so here, the majority appears to rely on the follow-up language in *Bruno* that "giving special precautionary instructions may be sufficient precaution depending on the facts of the case." *Id.* While the court here did, as noted above, give the jury general cautionary instructions the morning the article appeared in the newspaper, it is not as clear to me as it is to the majority that these instructions were sufficient to ensure that the jury had not been improperly influenced by the article. In the end, however, I believe that any error that resulted from the court's failure to question the jurors about the article was merely harmless as the evidence of Appellant's guilt was clearly overwhelming. Thus, I agree with the majority that Appellant is not entitled to relief on this claim.

Justice SAYLOR concurring.

While I concur in the result reached by the majority, I respectfully differ with its rationale supporting the disposition of several of Appellant's claims, including the following.

First, I view the resolution of Appellant's claim that the trial court abused its discretion in consolidating for trial the charges arising from the three separate homicides as a closer case than does the majority. *See* Majority Opinion at 189–91,

864 A.2d at 481 ("[I]t is difficult to conceive of any situation where the propriety of joinder could be clearer." (citation omitted)). In dismissing fairly substantial differences between the murders in terms of time, location, method, and victim characteristics, the majority relies on some fairly broad generalizations, for example, categorizing separate killings involving bludgeoning, strangulation, and stabbing under a single category of murder at close range by hand or hand-held instrument. Along similar lines, the majority emphasizes general locale (the east side of Allentown) to the exclusion of any express consideration of the substantial differences in the individual crime scenes; for example, the killing of Ms. Schmoyer involved abduction to a secluded, outside location, whereas, the other victims were killed in their homes.

In *Commonwealth v. Morris*, 493 Pa. 164, 425 A.2d 715 (1981), the Court conditioned consolidation of offenses under an identity justification upon a fairly strict requirement of distinctive *modus operandi*, requiring "such a high correlation in the details of the crimes that proof that the defendant committed one makes it very unlikely that anyone else but the defendant committed the others." *Id.* at 176, 425 A.2d at 721. *See generally* LEONARD PACKEL AND ANN BOWEN POULIN, PENNSYLVANIA EVIDENCE 404-9(6) (2d ed. 1999) (discussing the "signature" aspect of the use of other acts evidence to prove identity via *modus operandi*). In doing so, the Court specifically rejected an approach that would be limited to a demonstration that the crimes were merely of the same class (here, rape/murder) to support their joinder. *See id.* Although I view the similarities identified by the majority as minimally sufficient to implicate an exercise of discretion on the part of the trial court in consolidating these offenses, it is my position that the case tests the outer boundaries of *Morris*.[1]

1. Also in tension with *Morris* is the majority's reliance on evidence discretely proving each offense individually, for example, the presence of Appellant's DNA at each crime scene, to bolster its consolidation analysis. The presence of semen at each of three rape/murder scenes is not, in and of itself, reflective of a distinct method of operation any more than, for example, a fingerprint would be; rather, it is the discrete process of identification of the individual DNA samples found at each crime scene that creates the compelling comparison. The

Second, and particularly in light of the trial court's decision to try the crimes jointly, the case was a strong candidate for a change of venue or venire. Of the 159 venirepersons who were questioned, a negative response to questions probing media exposure was the rare exception. The prejudicial character of the publicity is also apparent from voir dire responses.[2] Indeed, the trial judges involved made various acknowl-

majority opinion also appears to incorporate a tendency in the decisional law to conflate the "identity" and "common scheme or plan" exceptions to the general rule against consolidation. *See* Majority Opinion at 193–94, 864 A.2d at 483. My preference, however, would be to preserve the distinctions that arise out of the design and function of the exceptions. *See generally* PACKEL AND POULIN, PENNSYLVANIA EVIDENCE 404–9(5), (6) (explaining the relevant distinctions).

Finally, it should also be noted that the admission of other acts evidence requires an assessment of the probative value of the evidence versus its prejudicial effect. *See Commonwealth v. Billa*, 521 Pa. 168, 177–78, 555 A.2d 835, 840 (1989); *accord* Pa.R.E. 404(b)(3). Applying this analysis, again, I view this as a very close case in terms of the trial court's judgment in permitting the joinder, particularly in a capital case in which it was known that the jurors would be called upon to assess different aggravating circumstances in relation to the separate crimes. Moreover, a demonstration of an evidentiary need is integral to the probative value versus prejudicial effect assessment. *See Billa*, 521 Pa. at 178, 555 A.2d at 840. Here, the joinder was premised, in significant part, as bearing upon the perpetrator's identity. The existence of DNA evidence in relation to each separate offense, however, diminishes the value of, and accordingly the necessity for, joinder (and the admission of other crimes evidence) in this regard.

2. *See, e.g.,* N.T. (voir dire), at 227 ("Well, when you read it and then you see it on T.V., and everybody is condemning a person, you figure he's actually guilty."); *id.* at 356 ("Well, what I've done —— from what I've read and everything else, I feel he's guilty right off the bat."); *id.* at 677 (Well, ... based on articles in the newspaper and the television and everything leads up, I thought, to his guilt."); *id.* at 849 (opining that Appellant was guilty "[a]fter reading yesterday's paper, yes, I did"); *id.* at 1042 (expressing the opinion that the venireperson could not be fair and impartial "[b]ecause of the newspaper media, everything I have read and heard"); *id.* at 1088 (expressing the opinion, based on television and newspaper coverage that, "I think he's guilty"); *id.* at 1267 (indicating that the evidence demonstrated Appellant's guilt, based on print media account of DNA evidence); *id.* at 1350 ("I was under the impression that there was a confession to one of the crimes from the newspaper."); *id.* at 1398 (opining as to Appellant's guilt based on newspaper accounts); *id.* at 1808 (indicating that "[t]here's a feeling of guilt there," based on media coverage); *id.* at 1888 (noting that one of the crimes was "really publicized"); *id.* at 1955 ("I do feel he's guilty," based on media coverage); *id.* at 1970 ("He did it. So, I guess, from

edgments concerning the notoriety of the case, *see, e.g.,* N.T., at 1799, and their efforts to diffuse the effect of the coverage were also apparent throughout the voir dire process. *See, e.g.,* N.T. (voir dire), at 1278 ("We cant let people be judged guilty or innocent by what the Morning Call says."); *id.* at 2167 ("You would be tried, and tarred and feathered in the newspaper. And I can tell you from personal experience, the paper is often wrong in not reporting it straight.").

Like the severance question, I therefore view this issue as a close one in terms of whether the trial court exceeded the outer boundaries of its discretion, and would caution that careful consideration should be given, in circumstances involving highly publicized, notorious, alleged serial crimes, to a defense request for a change in venue in order to ensure a fair trial. Ultimately, however, I concur with the majority that the present verdict need not be disturbed on this ground, given the existence of a cooling-off period,[3] and based on the

the news and the media, my immediate reaction was, like, he did it."); *id.* at 2070 (referencing an article indicating that Appellant "was either convicted or admitted to some other crime"); *id.* at 2142 ("I remember hearing about the time of the arrest that they were excited, or the possibility that we had our first serial killer"); *id.* at 2166 ("But I guess its more so the newspapers, the conversations you have at work. You kind of form an opinion. Whether you should nor shouldn't, you do form an opinion."); *id.* at 2190 (from media accounts and personal conversations, indicating "I feel there is some guilt there, yes."); *id.* at 2281 ("It seems that the defendant seems to be guilty, based on the information that seems to have been put out in the public media."); *id.* at 2307 ("I believe I said the newspaper information was leading that way, saying that he had done it."); *id.* at 2407 ("I can say from what I'm reading it appears that he is guilty."); *id.* at 2441–42 (expressing a fixed opinion of guilt based on media accounts); *id.* at 2564 ("In following the case, . . . if there's DNA evidence out there that is pointing in that direction, which I think there is, I think there's only one answer for it.").

3. It should be acknowledged, in this regard, that a significant number of venirepersons had read very recent articles concerning Appellant. The tenor of the voir dire, however, suggests that the more sensational coverage occurred contemporaneous with the crimes and Appellant's arrest. *See, e.g.,* N.T., (voir dire) at 2609 (noting that the venireperson learned of Appellant's crimes "when it was a hot item but that it faded.").

trial court's extensive efforts to screen out venirepersons whose opinions were fixed.[4]

Third, I differ with the majority's characterization that all of the requirements of *Commonwealth v. Smoyer*, 505 Pa. 83, 476 A.2d 1304 (1984), were satisfied in relation to the hypnotically-refreshed testimony of Denise Sam–Cali, *see* Majority Opinion at 217–19, 864 A.2d at 498, particularly since the analysis that follows this statement assumes that this was not in fact the case. *See* Majority Opinion at 219–21, 864 A.2d at 499. Indeed, since Ms. Sam–Cali's testimony relating to the sexual nature of her attack was derived solely from the hypnotic session, it was plainly inadmissible under *Smoyer's* second criterion. *See Smoyer*, 505 Pa. at 87, 476 A.2d at 1306. Notably, the trial court acknowledged as much. *See* Opinion on Post–Sentence Motions, *slip op.* at 33 (finding that, aside from the notice requirement, none of the other *Smoyer* requirements were satisfied). I also have difficulty with the majority's finding of neutrality for purposes of *Smoyer* on the part of a hypnotist who is a member of the law enforcement community. *See* Majority Opinion at 221–24, 864 A.2d at 500–01. I am in agreement, however, with the majority's determination that Appellant has failed to establish sufficient preju-

---

**4.** Also related to *voir dire,* based on a typographical error in Appellant's brief, the majority declines to review his claim that his counsel erroneously conceded in jury selection that the case involved first-degree murders. *See* Majority Opinion at 212–14, 864 A.2d at 495. Since, however, the transcript reference to counsel's statement is discernable in conjunction with this Court's independent review of the record, *see* N.T. (voir dire), at 2541, I would not deny Appellant merits review of his claim on such basis. On the merits, while counsel's comment was directed to a juror who became seated at Appellant's trial, I believe that its context made it sufficiently ambiguous as to whether counsel was referring to the charges lodged against Appellant to negate Appellant's ability to demonstrate prejudice, particularly in light of the defense presented and the trial court's instructions in the trial that followed.

Finally, as to *voir dire,* I respectfully differ with the majority's characterization of Dr. Zager's relationship with Drs. Mihalakis and Ross, under who he trained during his recent residency and with whom he had interacted in a professional capacity, as a remote one. I agree only that Appellant has failed to show prejudice in relation to this claim, particularly considering the deference due the trial court's determination that the relationship was not so substantial as to warrant a presumption of prejudice.

dice in relation to the *Smoyer* claims to demonstrate an entitlement to relief. *See id.* at 222–24, 864 A.2d at 501.

Next, to the extent that the majority's disposition of Appellant's claim of ineffective assistance of counsel in failing to develop mitigating evidence falling under the catch-all mitigator suggests a quantitative analysis, *see* Majority Opinion at 232–34, 864 A.2d at 507 ("We cannot find trial counsel ineffective for achieving exactly what Appellant alleges that they failed to do—establish the existence of the catch all mitigator."); *see also id.* at 237–39, 864 A.2d at 510, I disagree with this approach. The weight of the evidence presented, and not the ability to "count" the catch-all mitigator, is the dispositive factor in the death penalty statutes qualitative approach to the selection determination in capital sentencing. *See generally* 42 Pa.C.S. 9711(c)(4). Accordingly, and in light of the broad range of mitigation evidence which may fall under the umbrella of the catch-all circumstance, I believe that the ineffectiveness inquiry pertaining to the asserted failure to present adequate mitigation should generally entail a comparison of the mitigation evidence that was presented in the penalty phase of trial in relation to that which the defendant later claims should have been presented. *Accord Commonwealth v. Williams,* 557 Pa. 207, 248, 732 A.2d 1167, 1189 (1999) (implementing this comparative approach in relation to the reasonable strategy prong of the ineffectiveness inquiry).

Applying this approach, however, I agree with the majority's ultimate determination that Appellant is not entitled to post-sentence relief on this claim. At trial, counsel presented friends and family members who testified that Appellant was loyal, helpful, and companionable. Trial counsel also presented testimony from Appellant's brother, who testified to his conversion to Islam and positive developments arising in his life as a result, and prison authorities who testified to Appellant's positive prison record. Further, trial counsel attempted to demonstrate hardship faced by Appellant affecting his emotional and social development, including testimony from family members concerning his father's alcoholism, aggressiveness, and abusiveness, as well as the history of interven-

tion efforts such as special educational classes and juvenile placements, directed to addressing his disturbance in this regard. Trial counsel also presented testimony from a psychiatrist regarding his difficulties arising from drug and alcohol abuse and an anti-social personality disorder.

Appellant contends that defense counsel was ineffective for failing to present numerous witnesses (including educators, counselors, officials, and friends), who would have attested as to his good character, non-violent propensities, and family background, as well as multiple documents demonstrating his achievements in and connection to the community. A good portion of this evidence, however, is cumulative of what was presented during the penalty phase. To the extent that additional information is supplied, upon review, I do not consider it is as being of such a character or weight that it would have likely affected the penalty verdict, particularly taking into consideration the evidence that was actually presented. Additionally, deference is due to the common pleas court's acceptance of counsel's testimony that there was a strategic decision to curtail the presentation of character-based evidence, in light of substantial rebuttal evidence that was available to the Commonwealth. *See* Opinion on Post–Sentence Motions, *slip op.* at 56–57.

Next, I do not subscribe to the view that Appellant's claim relative to the evidence of torture adduced in the penalty-phase of trial is moot, in light of the vacation of his sentences in relation to the killings of Ms. Burghardt and Ms. Schmoyer. *See* Majority Opinion at 241–42, 864 A.2d at 512. The problem of potential spillover prejudice implicated by this claim is precisely the reason for the *Morris* Court's careful circumscription of consolidation of criminal offenses, *see Morris,* 493 Pa. at 176, 425 A.2d at 720, and I would not therefore reject out of hand the claim that such prejudice may have ensued in a case in which a defense request for severance has been denied, particularly where the claimed spillover relates to a subject as inherently prejudicial as torture. Moreover, the Court has an independent obligation in capital cases to review the record to ensure that the verdict was not the product of

passion, prejudice, or any other arbitrary factor. *See* 42 Pa.C.S. § 9711(h)(3). As this particular claim touches on the Court's statutory obligations in this regard, again, I believe that merits review is implicated. On such review of the record, however, I am satisfied that the jury performed its duties as instructed in relation to Appellant's claim as framed.[5]

Finally, I differ with the majority's analysis of Appellant's claim that his counsel were ineffective for failing to object to the prosecutor's improper references to Appellant's exercise of his Fifth Amendment right to remain silent during its penalty phase summation. In this respect, I do not regard statements that "we have not heard any remorse," N.T., at 2706, "[w]e have not heard any calling for the victims," *id.* at 2706–07, "[h]e sits there, to some degree, like a sphinx," *id.* at 2707, and "[t]hink about whether or not there is any remorse," *id.*, as indirect or fleeting. If repeated, explicit references to a defendant's failure to make himself heard at trial were not

---

5. In his claim, Appellant focus on the testimony of Dr. Mihalakis concerning the victims' emotional and physical suffering, claiming that it was not a proper subject for expert testimony. *See* Appellant's Brief at 122–26. While the Court has previously stricken a torture aggravator based on similar testimony, *see Commonwealth v. King*, 554 Pa. 331, 336–38, 721 A.2d 763, 781–82 (1998), a majority of the Court has more recently stated that there is nothing prejudicial in brief commentary by Dr. Mihalakis concerning his assessment of a victim's terror. *See Commonwealth v. Lopez*, 578 Pa. 545, 553–55, 854 A.2d 465, 470 (2004). Although I disagreed with this statement in *Lopez*, *see Lopez*, 578 Pa. at 559, 854 A.2d at 472–73 (Saylor, J., concurring), here, I do not view Dr. Mihalakis's testimony as so prejudicial as to support an inference of undue spillover prejudice.

It seems to me that the far more damaging evidence of torture, as concerns the potential for spillover prejudice, was the trial court's admission in the penalty phase of photographs of the victims that the Court had previously refused to admit in the guilt phase based on their potential to arouse passion. *See* N.T. (trial), at 2562 ("I don't like—I kept these pictures out of the guilt and innocence phase but because we're dealing with aggravating circumstances and the possibility of torture, I'm compelled to let you see these. I hope you'll not be too upset with them."). Appellant, however, does not raise the spillover prejudice claim in relation to these photographs (in a separate argument, Appellant does separately claim that the prejudicial effect of the photographs outweighed their probative value, *see* Appellant's Brief at 82; this claim, however, is not focused on the spillover aspect, but rather, on the threshold admissibility issue in relation to the purpose for which the evidence was offered in the first instance).

sufficient to constitute direct references to his silence, the invocation of the image of a sphinx relative to such failure surely is. Moreover, the Court has recently repudiated its decisions that approved similar commentary (for example, *Commonwealth v. Lester*, 554 Pa. 644, 669–70, 722 A.2d 997, 1009 (1998)), to the extent that such decisions were based on an erroneous position that the Fifth Amendment was inoperative in the penalty phase of a capital trial. *See Commonwealth v. Freeman*, 573 Pa. 532, 573–74, 827 A.2d 385, 410 (2003).[6]

Accordingly, I would hold that the relevant and controlling difference arises out of the burden of establishing prejudice allocable to Appellant (since the issue here arises in the form of an unpreserved claim of prosecutorial misconduct), as compared to the burden on the Commonwealth to establish harmlessness beyond a reasonable doubt relative to preserved claims of trial error. *See generally Commonwealth v. Howard*, 538 Pa. 86, 99–100, 645 A.2d 1300, 1307–08 (1994) (distinguishing between prejudice and harmless error review).

---

**6.** The decisional law also offers a "demeanor" justification to authorize prosecutorial commentary on a capital defendant's failure to show remorse. *See, e.g., Commonwealth v. Rice*, 568 Pa. 182, 212–13, 795 A.2d 340, 358 (2002). This justification, however, loses force where the prosecutor affirmatively states that the defendant has not been heard from concerning remorse (or any other subject, for that matter).